**STATE**

v.

**Ronald ST. JEAN.**

**No. 88–40–C.A.**

Supreme Court of Rhode Island.

Feb. 8, 1989.

James E. O'Neil, Atty. Gen., Jane McSoley, Asst. Atty. Gen., for plaintiff.

Daniel V. McKinnon, McKinnon & Harwood, Pawtucket, Martin W. Aisenberg, Nicholas E. Tishler, Jones & Aisenberg, Providence, for defendant.

## OPINION

KELLEHER, Justice.

On June 21, 1985, a multi-count indictment was returned charging Ronald St. Jean (St. Jean) with the commission of two counts of reckless driving, death resulting, and two counts of operating a motor vehicle under the influence of intoxicants, death resulting. Later, in mid-March 1987, a Superior Court jury returned guilty verdicts on all four counts. St. Jean is now before us on an appeal in which his counsel has argued that a new trial must be awarded because of the numerous erroneous evidentiary rulings made by the trial justice.

The relevant facts are as follows. In the early-morning hours of March 17, 1985, a red Camaro Z28 operated by St. Jean collided with a silver Corvette on Great Road in the town of Lincoln. The collision claimed the lives of St. Jean's two passengers. Great Road, as it meanders through the town of Lincoln, is a winding two-lane highway with a yellow line separating the westbound travelers from the eastbound travelers.

The first police officer to arrive at the scene, after making sure that the injured parties were receiving attention, spoke with St. Jean. According to the officer, St. Jean's breath smelled of alcohol and he was "swaying from side to side." The officer advised St. Jean of his rights and took him into custody in the belief that St. Jean had been operating the Camaro while under the influence of alcohol.

After advising St. Jean a second time of his rights, the officer drove him to the Smithfield police station where he was to be given a breathalyzer test.[1] A second officer, a certified breath analyzer, read St. Jean his constitutional rights, including those pertaining to the breath test. St. Jean signed a form indicating that he had read and understood his rights and that he was submitting to the test. When the test was complete, the results indicated that St. Jean's blood-alcohol content was .14 percent.[2]

The Lincoln police report indicates that while St. Jean was performing various tasks relating to his motor skills, the effects of his alcohol consumption were obvious. St. Jean also told the Lincoln police that he had drunk three beers at a Central Falls pub earlier that evening.

---

1. Smithfield and Lincoln are adjoining towns. It appears that on the date in question the Lincoln police were awaiting delivery of a certified machine from the Department of Public Health.

2. In *State v. Lussier*, 511 A.2d 958, 960 (R.I. 1986), we noted that "'[s]cientific evidence and sad experience demonstrate that any driver with 0.10 percent blood alcohol is a threat to the safety of the public and to himself.'" Visual impairment typically begins at between .03–percent and .08–percent blood-alcohol content and becomes significant in all subjects at .10 percent. Additionally, reaction-time impairment begins at .04 percent; judgment of distances, dimensions, and speed at .08 percent; and coordination and memory at .10 percent. The average-sized person of 160 pounds can reach a .10–percent blood-alcohol content after consuming as few as three or four average drinks (or beers) in an hour.

There was other evidence of St. Jean's alcohol consumption prior to the fatal crash. A friend of one of St. Jean's passengers testified that upon entering the passenger's apartment at 10:15 p.m. on March 16, 1985, she saw St. Jean and both of his passengers. Each had a can of beer in front of him or her. The trio soon departed for a pub which is situated in Central Falls. A representative of the pub was able to testify only that they arrived sometime after 10 p.m. He remembered that they ordered at least three rounds of beer between their arrival and 12:30 a.m., when last call was sounded.

Another witness testified that at about 12:55 a.m., he was sitting in his car, which was parked directly in front of the pub, when he saw St. Jean and his two companions emerge. St. Jean took the driver's seat, and the women entered through the passenger door. After starting the Camaro, St. Jean, in the witness's words, began to "squeal his tires" or "laid a patch" as he caused the automobile to spin its tires for fifty to sixty feet before coming within six inches of striking the witness's vehicle.

Another prosecution witness testified that in the early-morning hours in question, he was traveling east on Great Road and slightly ahead of a Corvette. As he was coming out of a curve, he noticed a red Camaro traveling toward him with its left wheels over the yellow dividing line. As the cars approached each other, the Camaro returned to its own lane. Soon after the Camaro entered the curve, the witness heard the squeal of tires and returned to find that the Corvette and the Camaro had collided. The impact appeared to have occurred on the righthand sides of the vehicles. The Corvette was turned sideways in its lane, facing a guardrail that ran along the northerly edge of the highway. The Camaro had continued past the Corvette and come to rest straddling the guardrail. The passenger who occupied the Camaro's rear seat was found about twenty-five feet beyond the guardrail in a marsh.

The two occupants of the Corvette testified. The driver told the jury that he was traveling at about thirty miles per hour on dry pavement and was about to enter a righthand curve when the Camaro that had just completed the curve began to go sideways into the eastbound lane.

The prosecution offered as evidence photographs taken at the scene of the collision, as well as photographs of both automobiles after they had been towed from the scene. These photographs clearly showed the damage to the vehicles as well as their relative positions after impact.

The sole witness for the defense was Dr. Donald H. Avery, a recognized expert in the fields of metallurgy and accident reconstruction. In his opinion, based upon the evidence, the collision was attributable to a failure in the operation of the Camaro's rear axle and not to St. Jean's drinking activities. This conclusion was based primarily upon his inspection of the pieces of broken axle and a comparison between the damage to the Camaro's right-rear-wheel well and its right-rear wheel. He also explained to the jury that in his opinion, at the instant of impact, the Corvette and the Camaro were moving at approximately the same speed.

■ The first claim of error in this appeal is that the trial justice erred in permitting a witness to testify over St. Jean's objection relative to the "tire squealing" episode and St. Jean's coming within six inches of hitting his automobile. St. Jean argues that since this incident occurred twenty-three minutes prior to the collision, it is too remote to be of any relevance. Alternatively, he argues that even if the incident is relevant on the issue of recklessness, its probative value is far outweighed by its likely prejudicial effect.

Evidence is relevant if it tends to make the existence of any fact in issue more or less probable than it would be without the evidence. *State v. Martini*, 460 A.2d 936, 938 (R.I.1983). The determination of whether evidence is relevant is a matter of discretion for the trial justice to resolve. *State v. Champa*, 494 A.2d 102, 106 (R.I. 1985); *State v. Ashness*, 461 A.2d 659, 674 (R.I.1983). In the exercise of this discretion, the trial justice must weigh the probative value of relevant evidence against its

potential prejudicial effect. *State v. Martini*, 460 A.2d at 938. Relevant evidence should be excluded when its prejudicial effect outweighs its probative value. *State v. Tavarozzi*, 446 A.2d 1048, 1051 (R.I. 1982). This court has previously held that it will not upset a trial justice's balancing unless his or her discretion has been abused. *State v. Martini*, 460 A.2d at 938; *State v. Pule*, 453 A.2d 1095, 1099 (R.I. 1982).

The evidence at issue here is certainly relevant to the question of St. Jean's state of mind some twenty-three minutes later, when the collision occurred. The "tire squealing" incident in front of the Central Falls pub demonstrates that St. Jean was in a particular frame of mind. The "patch" episode indicates a disregard for the safety of his passengers and any other individuals in the vicinity of the pub. Since this indifference was unlikely to change significantly during the ensuing twenty-three minutes, particularly considering St. Jean's alcoholic intake earlier in the evening, the evidence is relevant.

We also acknowledge that the evidence might have a prejudicial effect upon the jury. However, the fact that evidence may have a prejudicial effect does not render such evidence inadmissible. Here the trial justice undoubtedly weighed the potential prejudice against the probative value of the proffered evidence. Such a determination is an issue that involves the exercise of the trial justice's discretion. Since we find no abuse of discretion, we cannot fault the trial justice.

St. Jean also alleges abuse of discretion by the trial justice for his failure to exclude certain evidence presented by the state because of the state's failure to respond to certain discovery requests propounded by his attorneys, pursuant to Rule 16 of the Superior Court Rules of Criminal Procedure. The defense requested the production of a tape containing St. Jean's interrogation by the Lincoln police. This request was not fulfilled until several days before the trial commenced. Second, St. Jean complains that the state did not reveal to his attorneys the existence of a form relat-ing to his alleged refusal to submit to a chemical test that had been executed by the police on the morning of his arrest. Third, the prosecution is faulted in that the trial had been in progress for six days when the defense was provided with copies of the official records of the Rhode Island Department of Public Health that indicate that the machine used to test St. Jean's breath had been tested free of Radio Frequency Interference (RFI) on February 15, 1985.

When the trial justice learned of the belated production of the tape recording of the St. Jean interrogation, he compared the tape with the transcript that had been given to the defense earlier. He concluded that the tape and the transcript were identical in all material areas. Consequently he ruled that St. Jean had not been prejudiced by the late delivery.

Included in the record is a mimeographed document that has been referred to as a refusal-to-submit-to-a-chemical-test form. This form indicates that after being informed of his rights, "the suspect refused to submit to a chemical test upon the request of [a] Law Enforcement Officer." The testimony relating to this document indicates that the breathalyzer test is given in two stages. After the first stage was completed, St. Jean informed one of the officers present that he was "going to be sick." This officer conceded that when he executed the refusal form, he was under the mistaken belief that any complaint of sickness could be considered a refusal. Both officers who were present during the testing stated that at no time did St. Jean indicate that he wanted to stop the test. In light of this evidence the trial justice rejected St. Jean's efforts to exclude the breathalyzer results. The trial justice did, however, inform the jury that in order to consider the test results, they must conclude that St. Jean voluntarily submitted to the test.

Undoubtedly the existence of the refusal form could serve to impeach the prosecution's claim that St. Jean's submission to the test was entirely voluntary. However, we do not believe that an earlier disclosure of this form would have meaningfully add-

ed to the effectiveness of this impeachment. Therefore, St. Jean was not prejudiced by the late disclosure.

■ Another alleged "prosecutorial goof" involves the state health department records. In seeking to exclude the breathalyzer results, St. Jean had relied upon the state's failure to produce evidence that Smithfield's apparatus had been certified by the Department of Public Health to be free of RFI. Evidence adduced concerning this issue indicated that the Smithfield police kept an unofficial record of the State Department of Public Health's testing and maintenance of the machine. An examination of this unofficial record reveals an absence of any indication that the machine had been tested for the presence of RFI within the regulatory thirty-day period prior to St. Jean's test. However, this issue was put into its true perspective when a representative of the State Department of Public Health appeared to testify that the official records of the testing and maintenance of the breathalyzer machine are maintained by the department. He produced departmental records that indicate that the Smithfield machine had been properly tested for the presence of RFI.

Apparently this revelation was a bit of a setback for the defense. In recognition of the surprise, the trial justice suggested to the defense that it had three alternative courses of action. It could move for the suppression of the breathalyzer results; it could move for a mistrial; or it could move for a reasonable continuance. The defense decided to move for the suppression of the breathalyzer results. In denying the motion, the trial justice expressed the belief that suppression would be too drastic a sanction. At that point the defense decided not to pursue any of the other alternatives suggested earlier.

While Rule 16(i) provides sanctions for the failure of either party to comply with discovery requests, the imposition of any of the sanctions is a matter within the sound discretion of the trial justice. *State v. Concannon*, 457 A.2d 1350, 1353 (R.I. 1983); *State v. Coelho*, 454 A.2d 241, 244–45 (R.I.1982). Since the imposition of sanctions for failing to comply with Rule 16 is a discretionary matter for the trial justice, we shall find error only if this discretion is abused. After reviewing the record, we do not believe the trial justice abused his discretion as he resolved the discovery issues.

■ St. Jean again faults the trial justice for permitting highly prejudicial testimony concerning the speed of his car immediately preceding the collision. The prosecution asked Dr. Avery during cross-examination if in forming his opinion, he had considered deposition statements of two witnesses regarding the speed of the Camaro just prior to the collision. After responding in the affirmative, the doctor was asked if he acknowledged that the two witnesses had indicated in their depositions that the red Camaro was traveling at a high rate of speed. Dr. Avery said, "Yes." St. Jean claims that the allowance of this inquiry is error since it is little more than a backhanded way of getting before the jury evidence that was inadmissible in direct testimony.

The scope of permissible cross-examination rests within the sound discretion of the trial justice; it will be disturbed on appeal only in the event of abuse of discretion and then only when such abuse constitutes prejudicial error. *State v. Anthony*, 422 A.2d 921, 924 (R.I.1980). Also, this court has held that comprehensive cross-examination should be allowed in order to ensure that the jury's attention is directed to the factors upon which an expert witness has based his opinion. *Golden Gate Corp. v. Providence Redevelopment Agency*, 106 R.I. 371, 376–77, 260 A.2d 152, 156 (1969). It is the allowance of this cross-examination that gives the jury the opportunity to reject the testimony of an expert witness. *Id.*

In this case it is clear that Dr. Avery, in forming his opinion, had read the witnesses' depositions. The fact that he reached the opposite conclusion of the deponents should not place the subject beyond the permissible scope of cross-examination. Also, the trial justice gave the jurors an instruction relative to the permissible use of the deposition evidence. The jury was told that any reference to speed could only

be used to determine the basis of the expert's opinion in regard to the speed of the respective motor vehicles. Consequently we hold that it was not error for the trial justice to permit the expert to be cross-examined concerning estimates of speed contained in the witnesses' depositions.

The next error alleged by St. Jean is that the breathalyzer results should have been suppressed because in the administration of the test two portions of G.L.1956 (1982 Reenactment) § 31–27–2, as amended by P.L.1983, ch. 227, § 1 were violated. First, St. Jean alleges that he never voluntarily waived his right to refuse to take the test, in violation of § 31–27–2(c)(1). Second, he was not under "constant supervision" from the time of his apprehension to the taking of the test, as required by Regulation Part III Section 2.0(A)(2)(a), as promulgated by the Department of Public Health pursuant to § 31–27–2(g).

■ It is undisputed that § 31–27–2(c)(1) requires that a defendant consent to the taking of the breath test before its results are admissible. St. Jean alleges that he was unable to consent knowingly to the breath test since his injuries made him incapable of understanding his rights. The record indicates that St. Jean was informed of his rights at least three times prior to his consenting to the breath test. At various points he acknowledged both orally and in writing that he understood his rights. The record is devoid of any evidence that St. Jean ever expressed a desire to refuse to take the breath test.

Regarding the injuries received by St. Jean, this court, in *State v. Bruskie*, 536 A.2d 522 (R.I.1988), affirmed a trial justice's finding that a defendant had consented to a blood-alcohol test despite his claim that his serious injuries, including a concussion, a broken jaw, and a ruptured kidney, rendered him unable to give such consent. The court found such finding to be supported by the fact that the defendant had twice been apprised of his constitutional rights and that he consented to the test both by oral means and in writing.

In light of what was said in *Bruskie* and particularly the record of this case, we cannot say that the trial justice's finding that St. Jean voluntarily consented to the blood-alcohol test was clearly wrong.

■ St. Jean offers another reason why his breathalyzer results should have been suppressed. He refers us to Regulation Part III § 2.0(A)(2)(a), which provides that the suspect will be under "continuous observation." St. Jean points out that after he was advised of his rights, handcuffed, and patted down, he was placed in the back of a police cruiser. The officer then left St. Jean and returned to the collision scene where he checked to determine that all the victims had been accounted for. Upon returning some thirty seconds later, the officer transported St. Jean to the Smithfield police station where he remained under constant scrutiny through the entire span of the blood-alcohol test.

In considering this continuity contention, the trial justice conceded that even though the regulation was not followed to the letter, its spirit had not been violated. The obvious purpose of the regulation is to prevent defendants from ingesting substances that could affect the outcome of their blood-alcohol-testing procedures. During the thirty seconds when St. Jean was not supervised, he was handcuffed and locked in the back seat of a police cruiser. Nobody could get into or out of the cruiser without using a key. Given these facts, the intent of the regulation has been complied with.

■ St. Jean argues that he was deprived of a fair trial when the prosecution was allowed to cross-examine his expert witness in an improper fashion. Prior to trial, a Superior Court justice ordered that both vehicles involved in the collision be impounded. The order also prohibited the destructive testing of either vehicle. In August of 1986 an attorney representing an insurance company appeared before another Superior Court justice and sought to vacate the impoundment order on the ground that the insurer had paid St. Jean's collision loss and acquired legal title to the Camaro's remains. The motion to vacate was granted despite the objections of both

the state and the defense. The Camaro was no longer available for further testing. St. Jean also faults the vacating of the impoundment order because it forestalled any further testing of the Camaro's axle to buttress his defense that the axle had been severed prior to the collision.

St. Jean's expert testified on direct examination that after considering many factors, he was capable of forming an opinion regarding the cause of the collision. As noted earlier, the expert was of the belief that the collision had been caused by the operative failure of the Camaro's rear axle rather than St. Jean's intoxication. He also told the jury that at the time of impact both vehicles were traveling at roughly the same speed. This witness also informed the jury that, because of the court order, he had been unable to carry out certain destructive tests that he thought would have supported his position.

During cross-examination the expert was asked if he had examined the fractured axle with an optical or electron microscope. The expert responded in the negative as Dr. Avery explained that he was prevented from doing these tests by the court's ban on destructive testing. The expert was then asked if he had conducted a "negative replica" test on the fracture. Notwithstanding the fact that this particular test did not require destruction of the axle and would have yielded results similar to those gained by viewing the axle under the electron microscope, the expert conceded that he had not pursued this route. St. Jean contends that this line of questioning, which was allowed over his objection, was improper and denied him a fair trial.

Here again we are confronted with the question of the permissible scope of cross-examination, a matter that is addressed to the discretion of the trial justice. *Golden Gate Corp.*, 106 R.I. at 376, 260 A.2d at 155. This court has held that comprehensive cross-examination of experts should be allowed in order to bring to the jurors' attention all the factors upon which they base their opinions. *Id.* at 376–77, 260 A.2d at 156. Questions asked of Dr. Avery on cross-examination were designed to do

no more than test the reliability of his opinion. Whether he subjected the fractured axle to a microscopic inspection may be of some significance, since such a measure would have added credence to his opinion. By the same token, the fact that he failed to conduct the "negative replica" test is also relevant in regard to the soundness of the expert's opinion. Although the "replica" approach is not so sophisticated as an electron-microscopic analysis, it would allow an inspection of a replica of the axle and the results would have been consistent with those obtained by recourse to the microscope. The fact that this test was not attempted casts a cloud on St. Jean's claim that the destruction of the Camaro somehow prejudiced his defense. The state's line of questioning was fair game for cross-examination.

■ The final facet of St. Jean's appeal concerns a question asked of the passenger of the Corvette. The passenger in the Corvette made a brief appearance as a witness. She testified that as the Corvette traveled along Great Road, it was transporting her to her Central Falls home, and when asked if at a certain point on Great Road she recalled something happening, she answered in the affirmative. And when asked if she could describe the happening, this exchange occurred.

"A. Yes, the vehicle that I saw that was ahead of us had just turned around the bend and at that point there was another car coming towards us.

"Q. What did you see concerning that car coming towards you?

"A. I saw two headlights coming towards us very fast."

St. Jean's counsel moved to strike the conclusion about speed. The objection was overruled. St. Jean claims that the passenger was in no better position to give an opinion regarding the Camaro's speed than the operator of either the Firebird or the Corvette. When these individuals sought to give an estimate of speed, defendant's objection was sustained. However, the mere fact that the trial justice may have erred in these rulings is no reason to perpetuate error.

St. Jean's contention overlooks what this court held in *State v. Fogarty*, 433 A.2d 972, 975 (R.I.1981), when we endorsed Rule 701 of the Federal Rules of Evidence, which permits a nonexpert witness to testify to "'those opinions or inferences that are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.'" Earlier this court in *State v. Lutye*, 109 R.I. 490, 494, 287 A.2d 634, 637 (1972), observed that

> "[w]hile there is no hard and fast rule which tells us when a nonexpert may augment his testimony of what he saw with an opinion, there are broad principles which provide some guidance. Thus, it is established that he may venture an opinion where '* * * the subject matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time, and the facts upon which the witness is called to express an opinion are such as men in general are capable of comprehending.'"

With these principles in mind, we determine that the passenger's testimony was admissible.

She personally observed the Camaro approaching the vehicle in which she was a passenger. It is safe to say that each and every day many people, such as the passenger in the Corvette, make judgments about the speed of vehicles traveling along our highways. The fact that the passenger observed the vehicle for a brief period goes to the weight to be given her testimony rather than its admissibility.

In this instance the defense could have questioned the passenger regarding the length of her observation in an attempt to impeach the reliability of her opinion. However, his cross-examination was specifically and solely directed to a statement given the police on March 19, 1985, by the passenger as she lay in a hospital bed. In the statement, she had identified the vehicle in front of the Corvette as a "hot-red Firebird." The record does indicate that the vehicle in front of the Corvette was a Firebird.

It follows from what we have said that the defendant's appeal is denied and dismissed, the judgments of conviction are affirmed, and the case is remanded to the Superior Court.