730 A.2d 922

IN THE MATTER OF THE CIVIL COMMITMENT OF J.G.

Superior Court of New Jersey
Appellate Division

Argued March 2, 1999—Decided June 24, 1999.

Before Judges MUIR, Jr., KEEFE and EICHEN.

*Barbara Bakley–Marino*, Assistant Prosecutor, argued the cause for appellant, State of New Jersey, Cape May County (*Stephen D. Moore*, Cape May County Prosecutor, attorney; *Ms. Bakley–Marino*, of counsel and on the brief).

*Lorraine A. Gormley*, Deputy Public Defender, argued the cause for respondent J.G. (*Ivelisse Torres*, Public Defender, attorney; *Ms. Gormley*, on the brief).

*Maria Desautelle*, Deputy Attorney General, argued the cause on behalf of the Attorney General (*Peter Verniero*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney Gener-

al, of counsel; *Lisa Ciaston* and *Ms. Desautelle*, Deputy Attorneys General, on the brief).

The opinion of the court was delivered by

EICHEN, J.A.D.

This appeal involves interpretation of the Megan's Law [1] amendments, *L.* 1994, *c.* 134 [2] (the Megan's Law amendments) to the civil commitment statute, *N.J.S.A.* 30:4–27.1 to –27.23 (the civil commitment statute). On August 26, 1998, a Law Division judge vacated another Law Division judge's order that had temporarily committed J.G. to the Forensic Psychiatric Hospital after his release from the Adult Diagnostic and Treatment Center (Avenel) on grounds that the statutory procedures for such commitment had not been followed. The judge found that the prosecutor from the county that had originally committed J.G., the Cape May County Prosecutor, was required to seek such commitment after making an independent assessment of J.G.'s mental fitness and not the Middlesex County Prosecutor who represents the county where Avenel is located. The Cape May County Prosecutor filed an emergent application to stay the order discharging J.G. and to seek leave to appeal, both of which we granted on August 28, 1998. The Attorney General then joined the appeal. We reverse because we conclude that the relevant statutes did not prohibit the Middlesex County Prosecutor from initiating temporary involuntary commitment proceedings for J.G. upon his release from Avenel or the transfer of the proceedings to Cape May County for a final commitment hearing and disposition.

In January 1992, J.G. was charged under a Cape May County indictment with first degree aggravated sexual assault in violation

---

[1] Megan's Law collectively refers to a group of eleven bills enacted on October 31, 1994. *L.* 1994, *c.* 127–137.

[2] Chapter 134 is entitled "An act concerning procedures for civil commitment of mentally ill and dangerous sexual offenders and other offenders and revising various parts of the statutory law."

of *N.J.S.A.* 2C:14–2a; second degree sexual assault in violation of *N.J.S.A.* 2C:14–2c; and third and fourth degree endangering the welfare of a child in violation of *N.J.S.A.* 2C:24–4a. In April 1992, J.G. entered a guilty plea to aggravated sexual assault and was sentenced to a ten-year term of imprisonment with a five-year period of parole ineligibility. J.G. was directed to serve his sentence at Avenel.

In February 1998, the Commissioner of Corrections' designee sent a letter to notify the Cape May County Prosecutor's Office of J.G.'s scheduled release on June 26, 1998, because J.G. was about to complete his term of incarceration. The letter contained an "information package" that included, among other information about J.G., "[r]ecent psychological and psychiatric evaluations" as required by *N.J.S.A.* 30:4–82.4d and 2C:47–5d. The letter also indicated "it is believed that civil commitment is necessary and commitment proceedings are being initiated." The letter concluded, "You will be advised by subsequent memorandum of this inmate's transfer to the State Psychiatric Complex."

Thereafter, approximately ten days prior to the date J.G. was scheduled to complete his maximum sentence, he was examined by two Avenel psychiatrists. They each certified that J.G. suffers from bipolar disorder, pedophilia, and mild mental retardation, concluding that he "continues to have pedophilic fantasies about young boys" and would be a danger to himself and others if released into the community.

On June 17, 1998, the Middlesex County Prosecutor, filed an application in the Law Division seeking an order of involuntary commitment of J.G. The application was supported by the two clinical certificates from the Avenel staff psychiatrists pursuant to *N.J.S.A.* 30:4–27.10c and *R.* 4:74–7(b). After reviewing the certificates, a Law Division judge determined there was probable cause to believe J.G. was "in need of involuntary commitment," *see* *N.J.S.A.* 30:4–27.2m, and entered a temporary order committing J.G. to the Forensic Psychiatric Hospital in Trenton pending a

review hearing on July 8, 1998. *See N.J.S.A.* 30:4–27.10g and h; *see also R.* 4:74–7(c).

On June 18, 1998, the Commissioner's designee sent a letter to the Cape May County Prosecutor's Office advising that J.G. "has been civilly committed and transferred to the State Psychiatric Complex." The letter concluded that J.G.'s sentence would expire during his hospital confinement (on June 26, 1998) and enclosed a new "Sex Offender Registration Card" because J.G. had changed his intended address. Thereafter, on July 15, 1998, after noting that J.G. had "legal settlement" in Cape May County, a different Law Division judge ordered further proceedings transferred to Cape May County.

On July 10, 1998, the adjourned date for review of J.G.'s "continuing need for involuntary commitment," *N.J.S.A.* 30:4–27.12, J.G. informally applied for an order declaring his commitment illegal, dismissing the commitment proceedings and discharging him.[3] A Law Division judge assigned to review involuntary commitments, sitting in Burlington County, adjourned the review hearing for J.G. twice until August 26, 1998 in order to consider J.G.'s application. On that date, the judge heard oral argument. J.G. argued that the commitment was illegal because only the Attorney General or "the prosecutor of the county from which the person was committed" is statutorily empowered to initiate commitment proceedings. He argued that because only the Attorney General or the county prosecutor who committed J.G. was authorized to receive notification and the information necessary to determine whether J.G. was "in need of involuntary commitment," *see N.J.S.A.* 30:4–82.4b to d; *N.J.S.A.* 2C:47–5d, a prosecutor who did not have such notice and information could not perform an independent assessment of J.G.'s mental status or level of rehabilitation and, therefore, could not properly seek his

---

[3] On July 28, 1998, J.G.'s then attorney filed a letter brief. No formal motion was filed.

commitment. Accordingly, he maintained the commitment was illegal.

The Cape May County Prosecutor countered essentially that the plain language of the statute and common sense demanded that the court reject J.G.'s argument, asserting, among other things, that the civil commitment statute does not expressly restrict the authority of county prosecutors to initiate involuntary commitment of inmates from their own county and that, in fact, the Middlesex County Prosecutor had agreed to handle the initial proceedings for temporary involuntary commitments of inmates scheduled for release from Avenel whose commitments originated from other counties. In support thereof, the assistant prosecutor who was arguing the case for Cape May County certified that on February 11, 1998, she attended a Megan's Law meeting in Trenton at which "Assistant Prosecutors assigned to handle Megan's Law cases were present." She further certified that an assistant prosecutor from Middlesex County "indicated he would be filing the temporary application for civil commitment in appropriate cases of inmates at Avenel," after which the matters would be transferred to the county of commitment.

After oral argument, the judge granted J.G.'s motion, concluding that J.G.'s due process rights had been violated. The judge held that the civil commitment statute requires an independent psychiatric evaluation of the inmate to be conducted "to get some fresh blood in the case" in determining whether the person is "still mentally ill, or whether he [is] still dangerous" before the person can be involuntarily committed on a temporary basis. The judge also expressed concern that Middlesex County should not have to bear the costs and expenses associated with initiating such proceedings simply because Avenel was situated in the county. Accordingly, the judge declared J.G.'s commitment illegal and, on August 26, 1998, entered an order directing that J.G. be discharged. The judge, however, temporarily stayed the order to permit the Cape May County Prosecutor to seek leave to appeal.

As previously noted, on August 28, 1998, this court stayed the order discharging J.G., pending appeal, directed that the Attorney General receive notification of the appeal so he could participate in the proceedings, and ordered the Law Division to retain jurisdiction for purposes of conducting periodic reviews of J.G.'s status.

I.

In 1987, the Legislature passed a comprehensive civil commitment statute. *L.* 1987, *c.* 116 (codified at *N.J.S.A.* 30:4–27.1 to – 27.23, among other sections, as amended). *N.J.S.A.* 30:4–27.10 "identifies and implements two methods of commencing an action for an involuntary civil commitment: screening service referral or independent applications that require two clinical certificates, one from a psychiatrist, recommending involuntary commitment." *In the Matter of D.C.*, 146 *N.J.* 31, 42, 679 *A.*2d 634 (1996).

Specifically, *N.J.S.A.* 30:4–27.10 provides in part:

a. A short term care or psychiatric facility or a special psychiatric hospital shall initiate court proceedings for involuntary commitment by submitting to the court a clinical certificate completed by a psychiatrist on the patient's treatment team and the screening certificate which authorized admission of the patient to the facility; provided, however, that both certificates shall not be signed by the same psychiatrist unless the psychiatrist has made a reasonable but unsuccessful attempt to have another psychiatrist conduct the evaluation and execute the certificate.

b. Court proceedings for the involuntary commitment of any person not referred by a screening service may be initiated by the submission to the court of two clinical certificates, at least one of which is prepared by a psychiatrist. The person shall not be involuntarily committed before the court issues a temporary court order.

The statute also provides that if the court upon review of the certificates determines that a person is "in need of involuntary commitment," *see N.J.S.A.* 30:4–27.2m, it shall issue a temporary order authorizing the admission to or retention of the person in custody, *N.J.S.A.* 30:4–27.10g. The order is reviewable by the court within twenty days of the person's admission. *N.J.S.A.* 30:4–27.12a; *see also R.* 4:74–7(c)1. The order must also provide for the appointment of counsel for the committee. *N.J.S.A.* 30:4–27.12d; *see also R.* 4:74–7(c)2.

The procedures enacted by the Legislature in 1987, and the rules adopted by the Supreme Court pursuant thereto, were intended "to correct a long standing history of procedural abuses in the civil commitment process and to ensure that no person may be involuntarily committed to a psychiatric institution without having been afforded full procedural due process." *Matter of D.C., supra,* 146 *N.J.* at 43, 679 *A.*2d 634 (quoting Pressler, *Current N.J. Court Rules,* comment 1 on *R.* 4:74–7 (1995)). The legislative findings and declarations explain:

> Because involuntary commitment entails certain deprivations of liberty, it is necessary that State law balance the basic value of liberty with the need for safety and treatment, a balance that is difficult to effect because of the limited ability to predict behavior; and, therefore, it is necessary that State law provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, to others or to property, are involuntarily committed.
>
> [*N.J.S.A.* 30:4–27.1b.]

In 1994, the Legislature enacted Megan's Law, which included, among other new legislation, amendments to the civil commitment statute. *See L.* 1994, *c.* 134. These amendments revised the civil commitment procedures to insure the protection of the public against certain inmates scheduled for release from custody who have completed their maximum terms of incarceration but who are believed to be mentally ill and constitute threats to the public safety. *N.J.S.A.* 30:4–82.4 (Historical and Statutory Notes).

The Megan's Law amendments consist, in relevant part, of supplements to *N.J.S.A.* 30:4–27.10c, d, e, g and h, and a completely new section, *N.J.S.A.* 30:4–82.4, entitled "Procedures for inmates in need of 'involuntary commitment.'" They also include *N.J.S.A.* 2C:47–5d.

Revised subsection c of *N.J.S.A.* 30:4–27.10 expressly authorizes the "Attorney General" or "county prosecutor" to initiate involuntary commitment proceedings. It provides as follows:

> A court proceeding for involuntary commitment of an inmate who is scheduled for release upon expiration of a maximum term of incarceration shall be initiated by the Attorney General or *county prosecutor* by submission to the court of two clinical certificates, at least one of which is prepared by a psychiatrist.
>
> [*N.J.S.A.* 30:4–27.10c (emphasis added).]

Subsection a of *N.J.S.A.* 30:4–82.4 requires "the Attorney General" and "county prosecutors" to follow certain procedures "[i]n order to ensure that adult and juvenile inmates who are dangerous to themselves or others because of mental illness ... are not released without appropriate supervision and treatment." One such procedure requires the Commissioner of the Department of Corrections (the Commissioner) or the Juvenile Justice Commission, no less than ninety days before the date on which an inmate's maximum term is scheduled to expire, to notify and furnish all relevant information about the inmate to "the Attorney General and *the prosecutor of the county from which the person was committed* " in cases where the inmate has been convicted of a sexual offense and the court imposing sentence found that the inmate's conduct was characterized by a pattern of repetitive, compulsive behavior, or where the inmate may otherwise be "in need of involuntary commitment." *N.J.S.A.* 30:4–82.4b to d (emphasis added). *N.J.S.A.* 2C:47–5d contains a similar provision.

J.G. contends this restrictive language was intended to authorize only the prosecutor from the county where the inmate was first committed to initiate temporary involuntary commitment proceedings upon receiving notice of the inmate's pending release.

## II.

In construing a statute, a court's primary task is to "effectuate the legislative intent in light of the language used and the objectives sought to be achieved." *Reuben H. Donnelley Corp. v. Director, Div. of Taxation,* 128 *N.J.* 218, 227, 607 *A.*2d 1281 (1992) (quoting *Merin v. Maglaki,* 126 *N.J.* 430, 435, 599 *A.*2d 1256 (1992)). We are satisfied that the Legislature did not intend that an Avenel inmate should be released to the community simply because the prosecutor who initiated the commitment proceedings was not the prosecutor who originally received the notice and information required by *N.J.S.A.* 30:4–82.4 from the Commissioner.

The legislative findings and declaration accompanying *N.J.S.A.* 30:4–82.4 clearly explain that the new procedural amendments to the civil commitment statute were designed "[t]o ensure [that] the public is not denied the protection that the Legislature intended to provide in enacting a law that calls for the involuntary civil commitment of the dangerous mentally ill." *N.J.S.A.* 30:4–82.4 (Historical and Statutory Notes). Additional legislative history confirms that purpose:

Assembly Bill No. 86 of 1994 revises procedures governing the release and involuntary commitment of inmates convicted of certain sexual offenses to ensure that protection of the public is given due consideration. . . .

The bill authorizes the Attorney General or *the county prosecutors,* at their discretion, to initiate civil commitment of inmates determined to be mentally ill and dangerous to the public.

[Fiscal Estimate to Assembly Bill No. 86, at 1 (Sept. 26, 1994) (emphasis added) [hereinafter Fiscal Estimate]; *see also Matter of D.C.,* 146 *N.J.* 31, 53, 679 *A.2d* 634 (1996).]

This purpose was reiterated by the Supreme Court in *Matter of D.C., supra.* In that case, the Court observed that an Avenel inmate was released into the community without monitoring or supervision because the existing civil commitment statute had no "clear and effective means of confining dangerous individuals who are not mentally ill." *Matter of D.C., supra,* 146 *N.J.* at 54, 679 *A.2d* 634 (citation and internal punctuation omitted). To prevent this occurrence in the future, the *D.C.* Court stated that by the 1994 amendments to the civil commitment statute "the Legislature intended to enact remedial legislation to effectuate its purpose to confine persons who are found to be dangerous by virtue of mental illness." *Id.* at 55, 679 *A.2d* 634. The Court further noted that the amendments were intended " 'to correct [a] flaw' in the civil commitment statute." *Ibid.* (quoting Claudine M. Leone, Note, *New Jersey Assembly Bill 155—A Bill Allowing the Civil Commitment of Violent Sex Offenders After the Completion of a Criminal Sentence,* 18 *Seton Hall Legis. J.* 890, 896 (1994)). The Court also stated that the amendments

were designed to protect the public against a particular class of potentially dangerous people: convicted sex offenders. *The overall effect of the 1994 amendments to the involuntary civil commitment statute, N.J.S.A. 30:4–27.1 to 27.10, is*

*to "revis[e] procedures governing the release and involuntary commitment of
inmates convicted of certain sexual offenses" in order to ensure public safety. . . .*
The legislative history demonstrates that the Legislature pointedly intended the
amendments to address cases such as D.C.'s. In fact, D.C.'s release in 1992 was the
primary motivating factor behind the Legislature's enactment of these amend-
ments.

[*Matter of D.C., supra,* 146 *N.J.* at 54–55, 679 *A.*2d 634 (citations omitted)
(emphasis added).]

J.G.'s interpretation of the new amendments to require only the
prosecutor of the county that "committed" the inmate to initiate
the proceedings for an involuntary commitment is inconsistent
with the purpose and intent of the new legislation. These amend-
ments were designed to assure the public there would be more,
not less, protection from unrehabilitated "sexual predators." *See
id.* at 54 n. 1, 679 *A.*2d 634; *see also* Leone, *supra,* at 894–97. It
is unreasonable to believe that in enacting the Megan's Law
amendments to the civil commitment statute the Legislature in-
tended to limit the persons authorized to initiate a civil commit-
ment of a dangerous sex offender in the hyper-technical manner
urged by J.G. and endorsed by the trial judge.

In enacting the notice provisions contained in *N.J.S.A.* 30:4–82.4
and 2C:47–5d, it is apparent that the legislative goal was to assure
that the most interested law enforcement agencies would have
sufficient information and time to prepare an application for
involuntary commitment *before* the inmate is released into the
community, not *after.* As noted, "D.C.'s release in 1992 was the
primary motivating factor behind the Legislature's enactment of
these amendments." *Matter of D.C., supra,* 146 *N.J.* at 54–55, 679
*A.*2d 634. Thus, the legislative history envisions that the county
prosecutor who originated an inmate's commitment would be
provided with notice and all relevant information to independently
determine whether the inmate is "in need of involuntary commit-
ment" before the inmate's release. It is clear that such notice and
information was intended to enable the county prosecutor who is
familiar with the facts of the case and charged with ensuring the
public's safety to make a separate assessment of an institution's
decision to release an inmate and to "by-pass the faulty opinion of

the institutional psychiatrists," if necessary. *In the Matter of D.C.*, 281 *N.J.Super.* 102, 122, 656 *A.2d* 861 (App.Div.1995) (Shebell, P.J.A.D., dissenting), *rev'd*, 146 *N.J.* 31, 679 *A.2d* 634 (1996). Notably, J.G. has not produced any legislative history that suggests a contrary legislative purpose, namely that the required notice and information in respect of an inmate's scheduled release is to assure protection of the inmate's rights, nor could he. That is because the primary thrust of the Megan's Law amendments was to assure the safety of the public, not the due process rights of the inmate.

In addition to the clear legislative intent of the amendments, their plain language negates J.G.'s interpretation of those aspects of the civil commitment statute upon which he relies. Initially, we note J.G.'s reliance on *N.J.S.A.* 30:4–27.12c as support for its contention that only the county counsel or county adjuster may initiate temporary involuntary commitment. That interpretation is clearly erroneous. *N.J.S.A.* 30:4–27.12c deals specifically with procedures for hearings on "the *continuing* need for involuntary commitment," not the initiation of such proceedings (emphasis added). Indeed, *N.J.S.A.* 30:4–27.12c(2) specifically references the authority of a county prosecutor, without restriction, to initiate such proceedings: "[U]pon notice to the county adjuster ... [t]he county prosecutor may supersede the county counsel or county adjuster and assume responsibility for presenting any case for involuntary commitment *initiated by the county prosecutor* pursuant to subsection c of section 10 of *P.L.* 1987, *c.* 116 ( [*N.J.S.A.*] 30:4–27.10) ...." *N.J.S.A.* 30:4–27.10c. Consequently, *N.J.S.A.* 30:4–27.12c does not advance J.G.'s contention that only the Cape May County Prosecutor could initiate involuntary commitment proceedings.

Further, while *N.J.S.A.* 30:4–82.4e contains a procedure by which ordinarily the Commissioner, *upon request of the county prosecutor*, would obtain the clinical certificates necessary for an inmate's commitment, the statute does not mandate such a request. Here, where the Commissioner wrote to the Cape May

County Prosecutor on February 23, 1998 "that civil commitment is necessary and commitment proceedings are being initiated," a further request by the county prosecutor for a separate psychiatric assessment would have been superfluous. The Commissioner had already determined to commit J.G. and so advised the Cape May County Prosecutor's Office. Hence, no further participation by the Cape May County Prosecutor was required, at least not at the initiation stage. Thereafter, the Middlesex County Prosecutor made the application for temporary commitment of J.G., supported by the required certificates under the statute, *N.J.S.A.* 30:4–27.10b and c, and in accordance with the informal arrangements made at the Megan's Law meeting in Trenton in February 1997. Pursuant thereto, the Law Division judge in Middlesex County concluded there was probable cause to commit J.G. and ordered his commitment and transfer to the Forensic Psychiatric Hospital. *See N.J.S.A.* 30:4–27.10h. At no time were the merits of this decision challenged; nor are we aware of any appeals from the more recent orders continuing J.G.'s commitment which we expect were entered after the review hearings we required in our order staying the Law Division's order discharging J.G.[4]

Moreover, prior to the enactment of the Megan's Law amendments, the civil commitment statute did not by its express terms limit the persons permitted to initiate involuntary commitment proceedings. *See N.J.S.A.* 30:4–27.10b. Hence, we are satisfied that even without the new Megan's Law amendments any county prosecutor, indeed any interested party, could have initiated an involuntary commitment proceeding if they were armed with the required clinical certificates.

Accordingly, J.G.'s interpretation of the Megan's Law amendments and related court rules as limiting the authority of the

---

[4] J.G. complains that we should not consider the two staff psychiatrists' certificates because they are hearsay and were not made part of the record below. This argument is clearly without merit. *R.* 2:11–3(e)(1)(E). Notably, J.G. never contested the findings in the certificates or the court's determination of probable cause for J.G.'s temporary commitment.

county prosecutor to initiate temporary involuntary commitment to only those prosecutors who originally committed the inmate is a strained, if not absurd, interpretation. *See Innes v. Innes,* 117 *N.J.* 496, 509, 569 *A.*2d 770 (1990). That reading of the amendments requires us to ignore the specific provision in *N.J.S.A.* 30:4–27.10c which authorizes the *county prosecutor,* without any restriction, to initiate an involuntary commitment of an inmate scheduled for release by submission to the court of two clinical certificates.

Further, generally, statutory language should be construed as written, no broader than the language justifies, *Lynch v. Borough of Edgewater,* 8 *N.J.* 279, 285, 85 *A.*2d 191 (1951), and not according to some unexpressed intention. *In re Closing of Jamesburg High Sch.,* 83 *N.J.* 540, 548, 416 *A.*2d 896 (1980). We are mindful of the admonition that a "court is not at liberty to indulge in a presumption that the Legislature intended something more than what it actually wrote in the law." *Graham v. City of Asbury Park,* 64 *N.J.Super.* 385, 394, 165 *A.*2d 864 (Law Div. 1960), *rev'd on other grounds,* 69 *N.J.Super.* 256, 174 *A.*2d 244 (App.Div.1961), *aff'd,* 37 *N.J.* 166, 179 *A.*2d 520 (1962).

The order entered on August 26, 1998 declaring the temporary involuntary commitment of J.G. invalid and directing his release is reversed.