STATE

v.

Lisa A. DiSTEFANO.

No. 99–119–C.A.

Supreme Court of Rhode Island.

Dec. 20, 2000.

Lauren Sandler Zurier, Aaron L. Weisman, Providence, for plaintiff.

Randy Olen, Providence, John F. Cicilline, Bristol, for defendant.

Present: WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

GOLDBERG, J.

This case came before the Court pursuant to three questions certified from the Superior Court in accordance with G.L. 1956 § 9–24–27. The Superior Court asks us to consider for the first time whether G.L.1956 § 31–27–2(c) should be interpreted to preclude, for violations of § 31–27–2.2 (driving under the influence, death resulting), the admission at trial of the results of breath, blood or urine tests when the samples were seized without the defendant's consent, but pursuant to a search warrant issued by a justice of the Superior Court.

### FACTS AND PROCEDURAL HISTORY

The essential facts of this case are undisputed. The defendant, Lisa A. DiStefano (defendant), was charged by information with one count of driving under the influence of liquor or drugs (DUI), death resulting, in violation of § 31–27–2.2, and various counts of possession of a controlled substance, as the result of a tragic accident on June 15, 1997. At about eight o'clock that night, defendant drove from the Shell Gas station onto Post Road in Warwick, and her motor vehicle collided with a motorcycle driven by David Smith, who died as a result of the injuries he suffered in the accident. An on-scene investigation ensued; defendant was arrested for suspicion of operating a motor vehicle while under the influence of drugs or alcohol.

Subsequently, defendant was taken to the Warwick police station, where she submitted to a breath test, the results of which indicated a blood alcohol content (BAC) of .026. Sergeant Peter Johnson, a drug evaluation expert, performed a drug influence evaluation on defendant and con-

cluded that she was under the influence of a central nervous system stimulant. Sergeant Johnson asked defendant to submit to a blood test to determine the presence or absence of controlled substances. The defendant refused. The Warwick police then obtained a search warrant from a justice of the Superior Court to extract samples of defendant's blood and urine. The blood test, taken from a sample obtained at Kent County Hospital, revealed the presence of marijuana and cocaine.

Before trial, defendant filed a motion to suppress the introduction of the test results on the ground that her blood was drawn without her consent, in violation of § 31–27–2(c), and therefore, the test results were inadmissible, even though the police had obtained a judicially authorized search warrant. The Superior Court stayed further proceedings and propounded the following questions of law to this Court:

1. "In view of *State v. Timms*, 505 A.2d 1132 (R.I.1986), should R.I.Gen.Laws § 31–27–2(c) be interpreted to preclude, in a case involving an alleged violation of R.I.Gen.Laws § 31–27–2.2 (driving under the influence, death resulting), the admission at trial of the results of breathalyzer, blood or urine tests at trial, when the breath, blood or urine samples were seized without defendant's consent and pursuant to a judicially authorized search warrant?"

2. "Does the statutory language of R.I.Gen.Laws § 31–27–2.1, the Breathalyzer Refusal Statute, preclude members of law enforcement from obtaining a judicially authorized search warrant to seize a defendant's blood for alcohol or drug testing?"

3. "If R.I.Gen.Laws § 31–27–2.1 does preclude law enforcement from obtaining a search warrant, is this an unconstitutional limitation on the judicial authority to issue search warrants as provided

in Article 5 of the Rhode Island Constitution and R.I.Gen.Laws § 12–5–1?"

## RHODE ISLAND'S DRUNK–DRIVING LAWS—BACKGROUND

Although drunk-driving statutes have existed for some time, the collective awareness of the people of the State of Rhode Island led to an overhaul of the state's drunk-driving laws in the early 1980s. In 1982, the offense of driving under the influence of intoxicating liquor (DUI) was upgraded to a misdemeanor, and the necessity of producing competent evidence of intoxication in addition to proof of a defendant's blood alcohol level was eliminated.[1] A year later, the DUI statute, § 31–27–2, was further amended by the addition of subsection (b), which provided that any person charged with DUI, "whose blood alcohol concentration is one-tenth of 1% or more by weight as shown by a chemical analysis of a blood, breath or urine sample shall be guilty" of DUI.[2] In 1983, all statutory presumptions against a finding of intoxication were deleted from § 31–27–2.1, in an amendment entitled "Revocation of license upon refusal to submit to chemical test."[3] This amendment relieved the state of the necessity of producing expert testimony that demonstrated the effects of a given blood alcohol concentration on the accused. *See State v. Lussier*, 511 A.2d 958, 960 (R.I.1986). Further, the General Assembly enacted two additional felony offenses at that time, § 31–27–1.1, entitled "Driving so as to endanger, resulting in personal injury," and § 31–27–2.2, entitled "Driving under the influence of liquor or drugs, resulting in death."

## RHODE ISLAND'S DRUNK–DRIVING LAWS—PRESENT DAY

In the case at bar, defendant was charged under the current version of

1. P.L.1982, ch. 176, § 1.

2. P.L.1983, ch. 227, § 1.

3. P.L.1983, ch. 228, § 1.

§ 31–27–2.2,[4] driving under the influence of liquor or drugs, death resulting, a felony. Although this statute defines the crime of DUI, death resulting, and prescribes the punishment for that offense, it does not set forth the methods of proof to be used in determining whether the crime was committed. Rather, § 31–27–2(c)[5] provides that evidence of the amount of intoxicating liquor or drugs, as shown by chemical analysis of the defendant's blood, breath, or urine, is inadmissible unless the defendant has consented to the test. However, this subsection specifically references § 31–27–2(a), misdemeanor DUI, and makes no reference to felony DUI offenses. Therefore, the dispositive question for this Court is whether the Legislature intended to exclude nonconsensual test results in DUI felony cases by explicitly including the consent requirement for misdemeanor prosecutions and implicitly including the requirement in felony prosecutions. For the reasons that follow, the Chief Justice and I conclude that this Court's decisions in *State v. Timms*, 505 A.2d 1132 (R.I.1986), and *State v. DiCicco*, 707 A.2d 251 (R.I.1998), compel us to answer this question in the affirmative.

Our holding in *Timms*, in which we espoused the well-known canon of statutory construction *in pari materia* (statutes relating to the same subject matter should be construed together for consistency and to effectuate the policy of the law), would seem to indicate that consent would be necessary to make blood tests admissible, even in cases of DUI, death resulting. *Timms*, 505 A.2d at 1135. Although the issue before us in *Timms* involved a different public safety statute, namely § 31–27–1, entitled "Driving so as to endanger, resulting in death," our analysis of the two comparable statutes applies just as forcibly in this case. In *Timms*, we considered whether the actual consent requirement in § 31–27–2 would apply, or whether a written consent form, in accordance with the Confidentiality of Health Care Information Act, was required for hospital personnel to obtain defendant's blood. *Timms*, 505 A.2d at 1134–35. We stated:

"Although § 31–27–1 *** does not explicitly require that the defendant consent to the taking of a blood test before that test may be introduced as evidence in a criminal prosecution, the Legislature must have intended it to include the consent safeguards explicitly provided in § 31–27–2. Both statutes concern the same subject matter, namely driving in a manner so as to threaten public safety. Furthermore, in addition to the already-

---

4. General Laws 1956 § 31–27–2.2 provides, in pertinent part, that:
    "(a) When the death of any person other than the operator ensues as a proximate result of an injury received by the operation of any vehicle, the operator of which is under the influence of any intoxicating liquor, toluene, or any controlled substance *** the person so operating the vehicle shall be guilty of 'driving under the influence of liquor or drugs, resulting in death.'
    "(b) Any person charged with the commission of the offense set forth in subsection (a) shall, upon conviction, be punished as follows:
    (1) Every person convicted of a first violation shall be punished by imprisonment in the state prison for not less than five (5) years ***."

5. Section 31–27–2(c) provides, in pertinent part, that:
    "In any criminal prosecution for a violation of subsection (a) of this section, evidence as to the amount of intoxicating liquor, toluene, or any controlled substance *** in the defendant's blood at the time alleged as shown by a chemical analysis of the defendant's breath, blood, or urine or other bodily substance shall be admissible and competent, provided that evidence is presented that the following conditions have been complied with:
    (1) The defendant has consented to the taking of the test upon which the analysis is made."
    Section 31–27–2(a) provides that:
    "Whoever operates or otherwise drives any vehicle in the state while under the influence of any intoxicating liquor, drugs, toluene, or any controlled substance as defined in chapter 28 of title 21, or any combination thereof, shall be guilty of a misdemeanor and shall be punished as provided in subsection (d) of this section."

enacted §§ 31–27–1 and 31–27–2, the Legislature subsequently created § 31–27–2.2, 'Driving under the influence of liquor or drugs, resulting in death.' The consent safeguards in § 31–27–2.2 are also not explicitly in its text, yet the *Legislature would not have enacted two separate driving-under-the-influence sections, intending that the consent safeguards apply only to one.* 'It follows that if a mechanical application of a statutory definition produces an absurd result or defeats legislative intent, this court will look beyond mere semantics and give effect to the purpose of the act.' *** Thus ascertaining the intent of the Legislature, we are duty bound to give effect to that intent." *Timms,* 505 A.2d at 1135–36. (Emphasis added.)

Moreover, in *DiCicco,* a DUI death resulting case, we declared that, "[t]he wrong proscribed by § 31–27–2 is identical to that in § 31–27–2.2, namely, operating a motor vehicle while 'under the influence of any intoxicating liquor, toluene, or any controlled substance as defined [by law],' " and accordingly, we held that, "the well-known canon of statutory construction *in pari materia* dictates that similar statutes should be interpreted similarly." *DiCicco,* 707 A.2d at 253–54. Further, in *State v. St. Jean,* 554 A.2d 206, 211 (R.I.1989), a case of DUI, death resulting, we unequivocally declared that consent was a condition precedent to admissibility.

This Court has stated in scores of cases that when a statute is clear and unambiguous, there is no room for statutory interpretation and the language of the statute must be given its plain and literal meaning. *See, e.g., RIH Medical Foundation, Inc. v. Nolan,* 723 A.2d 1123, 1126 (R.I. 1999); *State v. Peterson,* 722 A.2d 259, 264

(R.I.1998); *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I.1996). One of the earlier cases that set forth this proposition in colorful language was *Kastal v. Hickory House, Inc.,* 95 R.I. 366, 187 A.2d 262 (1963), in which the Court commented:

"Only when the legislature sounds an uncertain trumpet may the court move in to clarify the call. But when the call is clear and certain as it is here we may not consider whether the statute as written comports with our ideas of justice, expediency or sound public policy. In such circumstances that is not the court's business." *Id.* at 369, 187 A.2d at 264–65 (citing *Blais v. Franklin,* 31 R.I. 95, 77 A. 172 (1910)).

Moreover, we are cognizant that in the fourteen years since our decision in *Timms,* the General Assembly has amended § 31–27–2 on nineteen occasions[6] and amended § 31–27–2.1 four times,[7] but has never revisited the issue of consent as a precondition to admissibility.

It is interesting to note that in the same year it enacted § 31–27–2.2, the General Assembly also enacted a new subsection, § 31–27–2.3, entitled "Revocation of license upon refusal to submit to preliminary breath test." This section, which is positioned beside § 31–27–2.2, provides that when a law enforcement officer has reason to believe that a person is driving or has actual physical control of any motor vehicle in this state while under the influence of alcohol, the officer may require such person to submit to a preliminary breath analysis. If the results of the preliminary breath analysis are positive, then the officer may arrest the driver and proceed to take further tests pursuant to

---

**6.** P.L.1986, ch. 275, § 1; P.L.1986, ch. 433, § 1; P.L.1986, ch. 494, § 2; P.L.1986, ch. 508, § 1; P.L.1989, ch. 149, § 1; P.L.1990, ch. 329, § 1; P.L.1990, ch. 496, § 1; P.L. 1991, ch. 65, § 1; P.L.1992, ch. 133, art. 37; § 6; P.L.1992, ch. 133, art. 94, § 1; P.L. 1992, ch. 405, § 1; P.L.1992, ch. 418, § 5; P.L.1993, ch. 138, art. 26, § 3; P.L.1994, ch. 70, art. 35, § 7; P.L.1995, ch. 370, art. 14,

§ 7; P.L.1996, ch. 224, § 1; P.L.1996, ch. 263, § 1; P.L.1998, ch. 91, art. 1, § 3; P.L. 1999, ch. 360, § 1.

**7.** P.L.1986, ch. 433, § 1; P.L.1986, ch. 508, § 1; P.L.1990, ch. 329, § 1; P.L.1994, ch. 70, art. 35, § 7.

§ 31–27–2.1. These further tests are subject to the safeguards recognized in *Timms*, as required by § 31–27–2. This statute further provides that if a person refuses to submit to this preliminary breath test, such person would be guilty of an infraction and subjected to the penalty specified in G.L.1956 § 31–41–4, which provides for suspension of a driver's license and fines to be imposed in the Traffic Tribunal.[8]

■ One of the statutory aids to construction is a maxim entitled *noscitur a sociis*, the literal translation of which is "[i]t is known from its associates." Black's Law Dictionary 1060 (6th ed.1990). The definition goes on to state that, "[u]nder the doctrine of '*noscitur a sociis*,' the meaning of questionable or doubtful words or phrases in a statute may be ascertained by reference to the meaning of other words or phrases associated with it." *Id.* (Emphasis added.) Thus, an application of this doctrine might cause one to construe the juxtaposition of §§ 31–27–2.2 and 31–27–2.3 as statutes that are interacting. Certainly, the *Timms* court determined that the consent safeguards provided in § 31–27–2 were applicable to the felony charge set forth in § 31–27–1, driving so as to endanger, death resulting. It cannot be said that such a construction is unreasonable, or that it amounts to judicial amendment of clear and unambiguous legislative pronouncements. With this background in mind, we shall now respond to the certified questions.

## DISCUSSION

### I

### Questions One and Two

Question one requires us to determine whether, in view of *Timms*, § 31–27–2(c) should be interpreted to preclude the admission of the results of breath, blood or urine tests in cases of DUI, death result-

ing, when the evidence has been seized without consent but with a judicially authorized search warrant. Question two asks us to determine whether the "none shall be given" language contained in the refusal statute, § 31–27–2.1, precludes members of law enforcement from obtaining a search warrant to seize blood for alcohol and drug testing. Inasmuch as the answer to question one is inextricably linked to the issue raised by question two, the issue respecting the admissibility of blood, breath or urine tests at any DUI trial, misdemeanor or felony, must begin with an examination of § 31–27–2.1.

### A

### Refusal to Submit to a Chemical Test

Section 31–27–2.1, entitled "Refusal to submit to chemical test," provides in subsection (a) that, "[i]f a person having been placed under arrest refuses upon the request of a law enforcement officer to submit to the tests, as provided in § 31–27–2, as amended, *none shall be given * * *.*" (Emphasis added.) This statutory prohibition against a chemical test in the absence of actual consent has never been amended by the General Assembly, and applies, according to the statute, to "[a]ny person who operates a motor vehicle within this state * * *." *Id.* Although this Court has held that the implied consent required by § 31–27–2.1 only is applicable in license revocation proceedings and cannot be substituted for actual consent necessary to the admissibility of the test results, we never have held that the mandate that no test shall be given is inapplicable in DUI cases, felony or otherwise. In fact, we never have been called upon to decide the applicability of the mandate "none shall be given."

In its brief, the state pointed to *State v. Berker*, 120 R.I. 849, 391 A.2d 107 (1978), as support for its position that the prohibition against a nonconsensual test in § 31–

---

8. General Laws 1956 chapter 41 of title 31 was repealed by P.L.1999, ch. 218, art. 2, § 1.

*See* G.L.1956 § 31–41.1–4, entitled "Schedule of violations."

27–2.1 has no bearing upon the questions before us today. We respectfully disagree. In *Berker*, after the defendant's arrest was declared illegal, the state sought to sustain the admissibility of his test results on the ground of actual consent, suggesting that the implied consent provisions of § 31–27–2.1 were a proper substitute for actual consent. We rejected this argument and declared that, "[it] is clear that the consent described in section 31–27–2.1 is applicable only in license revocation proceedings," and cannot serve to satisfy the actual consent necessary to admissibility in DUI cases. *Berker*, 120 R.I. at 857, 391 A.2d at 112. It is important to note that the defendant in *Berker* did not refuse to submit to a test, and this Court was not called upon to interpret that portion of the statute that provides that, upon a driver's refusal to submit to a test, "none shall be given." We have never held that this clear and unambiguous prohibition against compelling a driver to submit to a test is inapplicable in DUI cases, felony or misdemeanor. Indeed, were we to do so, such a holding would render that portion of the statute meaningless, in clear violation of our rules of statutory construction.

Although we often have stated that the DUI and the refusal statutes are two separate and distinct offenses for which there is no double-jeopardy bar, *State v. Jenkins*, 673 A.2d 1094, 1097 (R.I.1996), there is nonetheless an important temporal distinction between the two. The offense of refusal under § 31–27–2.1 can arise only after a driver had been arrested, informed of his or her rights, asked to submit to a chemical test, and refused, whereas DUI cases begin with an arrest based upon probable cause to believe that the driver had been driving while under the influence of alcohol or drugs, too often resulting in death or serious injury. An officer's request that a driver submit to a chemical test is one of the first steps in the investigation of a drunk-driving fatality. Although the offense of DUI, death resulting, already has been committed, unless and until the suspect actually refuses to submit to a test, he or she has not committed the additional offense of refusal, at which point the prohibition against compelling a test becomes operable.

■ The clear language of § 31–27–2.1(a) requires that, "[a]ny person who operates a motor vehicle within this state shall be deemed to have given his or her consent, to chemical tests of his or her breath, blood, and/or urine for the purpose of determining the chemical content of his or her body fluids or breath," and that, "[i]f a person having been placed under arrest refuses upon the request of a law enforcement officer to submit to the tests, as provided in § 31–27–2, as amended, *none shall be given,* but an administrative judge of the [traffic tribunal shall be notified]." (Emphasis added.) Thus, it is clear to us that the implied consent statute contained in § 31–27–2.1 applies to any person who operates a motor vehicle in this state, and applies to every arrest for DUI, whether it be felony or misdemeanor, and that upon refusal, no test shall be given. It is inconceivable that the Legislature would cloak a driver charged with the lesser offense of misdemeanor DUI with the protections afforded by § 31–27–2.1, and not afford those same protections to a motorist accused of the more serious felony offenses.

■ We note that in addition to the statutory penalties for refusal,[9] a driver may nonetheless be charged with DUI, felony or otherwise, and a conviction can rest on evidence other than BAC evidence, including the opinion of the experienced

---

**9.** Section 31–27–2.1(a) provides that if a person refuses to submit to a test, "an administrative judge of the [traffic tribunal] \*\*\* shall promptly order that the person's operator's license or privilege to operate a motor vehicle in this state be immediately suspended and

that the person's license be surrendered within five (5) days of notice of suspension,"[1] and a fine and license suspension will follow, the amount and length of which is determinate upon whether the driver had previously violated this statute.

officer that the driver gave every appearance of intoxication. *See DiCicco,* 707 A.2d at 255. However, nothing in § 31–27–2.1 or in the case law of this state suggests in any way that a driver who has refused to submit to a test can be compelled to submit against his or her will, whether or not the officer is armed with a search warrant. The words "none shall be given" are plain and unambiguous, and evince the intent of the General Assembly of this state that consent to a test is the lynch pin to admissibility.

We reject the state's argument that the phrase "none shall be given" has no applicability beyond the issue of whether a driver may be charged with refusal under § 31–27–2.1. At oral argument, the state was unable to enunciate any police department or Attorney General policy respecting cases in which the defendant refuses to cooperate with the medical technician and forcibly resists the extraction of blood or urine. The state was unable to explain what the response of the police would be in cases of physical resistance by the suspect, nor was the state able to explain under what statutory authority hospital personnel can be required to extract blood or urine from a driver who resists, or whether the police departments have agreed to indemnify the innocent medical technicians in the state's emergency rooms against subsequent claims of assault or medical malpractice for performing a medical procedure without the consent of the patient.

Further, the state was unable to indicate whether the Warwick police or the Attorney General have developed any policies and procedures relative to the amount of force and restraint that may be exerted upon an intoxicated individual who refuses to cooperate. Nor has there been any mention of the real danger a cocktail of blood, needles, and a resistant, intoxicated motorist presents to those who attempt to subdue the suspect in order to draw blood. Indeed, when asked these questions at oral argument, the attorney for the state acknowledged the need for greater consideration of these issues. The question we ask is, consideration by whom? Certainly not this Court, nor a member of the Executive Branch of state government, nor the local police departments. We are satisfied that this area is clearly within the province of the General Assembly.

■ Accordingly, a majority of the members of the Court conclude that the language "none shall be given" is plain and unambiguous and becomes operative after a suspect refuses a chemical test, and that, upon such a refusal, a test shall not be given, with or without a warrant, to "[a]ny person who operates a motor vehicle within this state," pursuant to § 31–27–2.1(a).

**B**

**Forcible Seizure of a Suspect's Blood**

We are equally satisfied that, in addition to the prohibition contained in § 31–27–2.1, there are sound public policy reasons behind the requirement that a defendant consent to a test before one may be undertaken. In *State v. Locke,* 418 A.2d 843 (R.I.1980), a DUI case, the defendant alleged that, notwithstanding his consent to a breath test, the police subjected him to an unreasonable search and seizure. In reliance on *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the justices of this Court concluded that the test was reasonable and we declared our belief that the Legislature created the consent requirement of § 31–27–2.1 "to prevent a violent confrontation between an arresting officer and a suspect unwilling to submit to a test of this sort." *Locke,* 418 A.2d at 849. These policy considerations obtain today. In this case, the state was unable to explain how medical personnel at Kent County Hospital came to agree to draw defendant's blood without her authorization and consent. Moreover, as will be discussed *infra,* there is no statutory authorization for the issuance of a search warrant for the seizure of bodily fluids, and the state's suggestion that

there can be a valid "judicially authorized warrant" is without merit.

Importantly, in the majority of states that admit evidence of a defendant's BAC when the blood or urine was drawn without compliance with implied consent procedures, there exists a statute that either requires or permits the withdrawal of blood in felony DUI cases. In *State v. Robarge*, 35 Conn.Supp. 511, 391 A.2d 184 (1977), a case relied upon by the state in the case at bar, the Superior Court of Connecticut, Appellate Session, held that the State of Connecticut's failure to establish that the defendant-motorist consented to the taking of a blood sample that was seized at the direction of the state's medical examiner after the death of her passenger was irrelevant because consent applied only to prosecutions for DUI, not to those for vehicular homicide cases. However, Connecticut's implied consent statute does not prohibit the seizure of blood after a refusal, and in fact, it authorizes a test of a motorist's blood by or at the direction of the state's medical examiner after a fatal accident.[10]

In addition to Connecticut, several states have amended their respective implied consent statutes in response to judicial pronouncements that the prohibition against a test in the face of a refusal applies to felony, as well as misdemeanor, offenses. Indeed, many of these jurisdictions faced issues similar to those facing us today. In *State v. Bellino*, 390 A.2d 1014, 1020 (Me.1978), the Supreme Judicial Court of Maine, citing the "great concern over the right of the State to take blood or breath samples of the motoring public," interpreted Maine's then-existing implied consent statute, and concluded that an arrest and the actual consent of the offending motorist were conditions precedent to the admissibility in both misdemeanor and felony cases, and suppressed the results of a blood test in a DUI, death resulting, case in which the blood was drawn by a nurse at the direction of a police officer. Maine's implied consent statute has since been amended, and carves out an exception for those who drink, drive, and kill. Maine's present statute[11] not only requires the withdrawal of blood from a DUI suspect involved in an accident resulting in death, it provides immunity for any medical technician who performs the test.[12] Likewise, Vermont's current implied consent law specifically authorizes a law enforcement officer, upon the refusal of a motorist to submit to a test, to secure a search warrant to obtain a blood sample in any DUI case resulting in serious bodily injury or death.[13]

Moreover, the history of the State of New Hampshire concerning the applicability of that state's implied consent law to

---

**10.** General Statutes of Connecticut § 14–227c (West 1999), entitled "Blood and breath samples following fatal accidents," provides in part that:

"To the extent provided by law, a blood or breath sample may also be obtained from any surviving operator whose motor vehicle is involved in such [a fatal] accident. The test shall be performed by or at the direction of a police officer according to methods and with equipment approved by the Department of Public Safety and shall be performed by a person certified or recertified for such purpose by said department or recertified by persons certified as instructors by the Commissioner of Public Safety. The equipment used for such test shall be checked for accuracy by a person certified by the Department of Public Safety immediately before and after such test is performed. If a blood test is performed, it shall be on a blood sample taken by a person licensed to practice medicine and surgery in this state, a qualified laboratory technician, an emergency medical technician II, a registered nurse or a phlebotomist, as defined in subsection (m) of section 14–227b. The blood samples obtained from the surviving operator shall be examined for the presence and concentration of alcohol by the Division of Scientific Services within the Department of Public Safety."

**11.** Me.Rev.Stat.Ann. subchapter IV of tit. 29–A (West 1996).

**12.** Me.Rev.Stat.Ann. tit. 29–A, § 2528 (West 1996).

**13.** Vt.Stat.Ann. tit. 23, § 1202(f) (1999).

DUI death cases also is instructive. In *State v. Berry*, 121 N.H. 324, 428 A.2d 1250, 1251 (1981), the Supreme Court of New Hampshire held that the provision in that state's implied consent statute providing that, " 'if a person under arrest refuses *** to submit to a chemical test *** *none shall be given*,' " was applicable in DUI cases and in cases of negligent homicide, and found there to be nothing in "the legislative history of the implied consent statute, to indicate that the words 'none shall be given' were intended by the legislature to mean other than that no chemical test shall be administered without the accused's consent." The New Hampshire legislature amended the statute with the specific intent "to eliminate the prohibition against the taking of a chemical test to determine intoxication where a person is under arrest for any offense *other than a violation or misdemeanor ***.*" *State v. Wong*, 125 N.H. 610, 486 A.2d 262, 273 (1984) (quoting N.H.Rev.Stat.Ann. § 563:3 (1981)). New Hampshire now has a statute requiring the testing for evidence of alcohol or drug consumption for all persons involved in a collision that results in death or serious bodily injury to any person, including all deceased vehicle occupants and any pedestrian involved in the collision, but in the case of a living driver, the officer must have probable cause to believe that the driver caused the collision.[14]

Additionally, the State of Maryland's experience is almost identical to the case at bar. Prior to 1982, Maryland's implied consent statute required that certain procedural steps be taken before a chemical test was administered. In *Loscomb v. State*, 45 Md.App. 598, 416 A.2d 1276 (1980), the Court of Special Appeals declared the implied consent statute applicable to all DUI death offenses, including the prohibition against a compulsory test.

Thereafter, the Legislature amended Maryland's implied consent statute to require a driver to submit to a chemical test in all accident cases resulting in death or serious injury to another person. It also provided immunity from liability to any medical personnel who perform the test.[15]

Similarly, a survey of many other jurisdictions throughout the United States with statutes that provide that "none shall be given" when a driver refuses to consent to a test demonstrates that statutory authorization of some kind is necessary for the compulsory withdrawal of blood upon a refusal. Included in this survey is the State of New Mexico, where that state's Court of Appeals found that, "[t]he act of obtaining a search warrant to circumvent the statutory prohibition [against the giving of a test upon a refusal] *** is unavailing," and held that the implied consent statute under consideration contained no exceptions for a search for a driver's blood alcohol content. *State v. Steele*, 93 N.M. 470, 601 P.2d 440, 441 (Ct.App.1979). The court invited the Legislature to write an exception into the law and refused "to encroach upon the legislative prerogatives by judicial fiat or, even, by applying constitutional exceptions to statutes specifically denying such exceptions." *Id.* The Legislature reacted. New Mexico's present refusal statute contains a specific exception for the issuance of a search warrant authorizing chemical tests upon a finding of probable cause that a person was driving under the influence and caused the death or great bodily injury of another.[16]

Although this Court believes it unnecessary to continue to canvass the remaining states, we find the experience of the State of Tennessee particularly relevant. That state's implied consent statute prohibits the admission of test results taken after a refusal, but contains a specific exception for the admissibility of evidence in criminal

14. N.H.Rev.Stat.Ann. tit. 21, § 265:93 (1993).

15. Md.Code Ann., Transportation § 16–205.1(c) (Michie 1999), *"Circumstances under*

*which chemical tests required; administration; liability."*

16. N.M.Stat.Ann. § 66–8–111 (Michie 1998).

prosecutions for aggravated assault or homicide by the use of a motor vehicle for blood drawn by "any means lawful," [17] including the warrantless seizure of blood based upon probable cause. Moreover, the states of Alaska,[18] Arizona,[19] Iowa,[20] Florida,[21] Indiana,[22] Michigan,[23] and Texas [24] all have statutes specifically authorizing the forcible seizure of blood in DUI cases. Further, in three states, these statutes specifically were revised in response to judicial decisions barring the forcible seizure of blood. *See Pena v. State*, 684 P.2d 864 (Alaska 1984); *Collins v. Superior Court*, 158 Ariz. 145, 761 P.2d 1049 (1988); *State v. Hitchens*, 294 N.W.2d 686 (Iowa 1980).

Accordingly, a majority of this Court holds that under the existing statutory framework, consent is a condition precedent to admissibility. Further, the Chief Justice and I conclude that our holding in *Timms* furnishes direct authority for the requirement that a defendant give his or her consent in DUI, death resulting, cases before the results of blood tests may be admitted. The Chief Justice and I are not persuaded that we should revisit this holding to sustain the admissibility of blood evidence drawn pursuant to a search warrant.

We are of the opinion that any changes to this mandate must emanate from the General Assembly. Further, we answer question two in the affirmative, and hold that in cases in which a motorist has refused consent, members of law enforcement are precluded from obtaining a search warrant to seize blood for alcohol or drug testing.

## II

### Question Three

Question three requires this Court to decide whether a determination that § 31-27-2.1 precludes law enforcement personnel from obtaining a search warrant for the seizure of blood amounts to an unconstitutional limitation of the judicial authority to issue search warrants as provided in article 5 of the Rhode Island Constitution and G.L.1956 § 12-5-1.

To properly answer this question, we must construe still another portion of the General Laws, namely §§ 12-5-1 and 12-5-2, which deal with the issuance of search warrants. Section 12-5-1 provides that a search warrant may be issued by any judge of the District Court and that "[n]othing contained in this chapter shall be so construed as to restrain the power of the justices of the supreme or superior courts by virtue of § 8-3-6 to issue a search warrant." [25] However, the authori-

---

**17.** Tenn.Code Ann. § 55-10-406(e) (1998).

**18.** Alaska Stat. § 28.35.035 (1998), "Administration of chemical tests without consent."

**19.** Ariz.Rev.Stat.Ann. § 28-1321D.1. (West 1998).

**20.** Iowa Code Ann. § 321J.10 (West 1997).

**21.** Fla.Stat.Ann. § 316.1933(1) (West 1990); *see State v. Slaney*, 653 So.2d 422 (Fla.Dist.Ct. App.1995).

**22.** Ind.Code § 9-30-6-6(g) (1999).

**23.** Mich.Comp.Laws Ann. § 257.625a(6)(b)(iv) (West 2000 Supp.), "a test shall not be given without a court order, but the peace officer may seek to obtain [such] a court order."

**24.** Tex.Transp.Code Ann. § 724.012(b)(2) (West 1999) provides that a peace officer shall require the taking of a person's breath or blood specimen if "the person was the operator of a motor vehicle *** involved in an accident that the officer reasonably believes occurred as a result of the offense [of DUI]."

**25.** General Laws 1956 § 8-3-6, entitled "Justices as conservators of peace—Powers in criminal cases," provides that "[t]he justices of the supreme and superior court shall, by virtue of their office, be severally conservators of the peace throughout the state, and shall severally have the same power in criminal cases throughout the state that district courts have in their respective districts."

ty for the issuance of a search warrant is found in § 12–5–2, which provides:

"**Grounds for issuance.**—A warrant may be issued under this chapter to search for and seize any property:

(1) Stolen or embezzled, or obtained by any false pretense, or pretenses, with intent to cheat or defraud within this state, or elsewhere;

(2) Kept, suffered to be kept, concealed, deposited, or possessed in violation of law, or for the purpose of violating the law;

(3) Designed or intended for use, or which is or has been used, in violation of law, or as a means of committing a violation of law; or

(4) Which is evidence of the commission of a crime."

The only portion of § 12–5–2 that is remotely relevant to this case is subsection (4), which authorizes the issuance of a warrant for the seizure of any "property" that is "evidence of the commission of a crime." A survey of the remainder of our statutes discloses no authorization to issue a search warrant for the withdrawal and seizure of blood or other bodily fluids. The seizure of a suspect's blood involves the use of a needle and the location and puncture of a vein to extract the fluid. Although not as physically intrusive as the forcible extraction of a prisoner's stomach contents in search of evidence of a crime, *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183, 190 (1952), a blood draw is nonetheless an intrusion be-

yond the body's surface that affects one's human dignity and privacy. *Schmerber,* 384 U.S. at 769–70, 86 S.Ct. at 1835, 16 L.Ed.2d at 919.[26] Further, although the alcohol content of a motorist's blood is relevant to the degree of intoxication in a DUI trial, we are not satisfied that one's bodily fluid is "property" or evidence of the commission of a crime. We note that it is not the blood itself that is the "evidence of the commission of a crime," but rather the test results that are relevant in a criminal trial. Thus, we are of the opinion that the General Assembly, by its enactment of § 31–27–2.1, as well as the limited power to issue search warrants that has been conferred upon the judiciary by § 12–5–2, has not specifically authorized the issuance of a search warrant for such a purpose. Moreover, we are ever mindful that the Rhode Island Constitution deals with search warrants only in the negative sense. Article 1, section 6, of the Rhode Island Constitution reads as follows:

"**Search and seizure.**—The right of the people to be secure in their persons, papers and possessions, against unreasonable searches and seizures, shall not be violated; and no warrant shall issue, but on complaint in writing, upon probable cause, supported by oath or affirmation, and describing as nearly as may be, the place to be searched and the persons or things to be seized."

■■■ This Court has long recognized that the Superior Court is statutory in origin and derives its powers from statutes

---

**26.** Our dissenting colleagues have taken us to task because we have recognized that forcible seizure of blood from a prisoner by untrained law enforcement personnel gives rise to concerns about privacy, human dignity and the safety of the officer as well as the prisoner. The dissent has accused us of demonstrating an "apparent compassionate concern" for these "chemically-impaired drivers" who may be forced to suffer the "profound and lasting horror" of a nonconsensual blood draw. We respectfully disagree. It is the duty of this Court to decide cases based upon constitutional, statutory, and decisional law, rather than coddle those who drink and drive. We

recognize that this task may be unpleasant and unpopular and may result in the exclusion of relevant evidence based upon perceived technicalities. However distasteful the result, it is not the province of this Court to invade the domain of the Legislature in order to create a more palatable result at the expense of individual liberty and privacy interests. Further, although it has excoriated the majority for concluding that blood may not be drawn without the prisoner's consent, the dissenting opinion contains no suggestion or guidance relative to how, by whom, and under what circumstances a prisoner's blood may be *forcibly* seized.

duly enacted by the Legislature.[27] This power cannot be extended by judicial interpretation, *Boss v. Sprague*, 53 R.I. 1, 162 A. 710 (1932), nor by a policy adopted by the Executive Branch of state government. The scope of the Superior Court's warrant authority is delineated by the Legislature, in which all power not explicitly granted to another branch of government resides. *Kass v. Retirement Board of the Employees' Retirement System*, 567 A.2d 358, 361 (R.I.1989). The Superior Court has no inherent power to issue a search warrant, but instead exercises only those powers that are conferred by statute. Indeed, the General Assembly has not hesitated to extend the scope of the judicial power to issue search warrants by specific legislative action covering a wide range of subjects, including G.L.1956 § 11–19–24, which authorizes search warrants for gambling apparatus and paraphernalia; G.L.1956 § 11–34–4, authorizing the issuance of a warrant to search a house of prostitution; G.L.1956 § 19–26–13, authorizing the issuance of a search warrant to search the premises of a pawnbroker for stolen property; G.L.1956 § 30–9–11, authorizing the adjutant general of the national guard to obtain a warrant for the search and seizure of arms, ammunition, uniforms, or other military equipment belonging to the military; G.L.1956 § 3–12–4, authorizing the issuance of a search warrant for the search and seizure of any impure or adulterated liquors; G.L.1956 § 4–1–19, authorizing the issuance of a search warrant to search any place believed to be connected to the cruelty of animals; and finally, G.L.1956 §§ 12–5.1–4 and 12–5.2–2, authorizing the interception of wire communications and the issuance of an order for the use of a pen register or telephone trap. Moreover, the General Assembly has authorized the seizure of a host of material by the state's law enforcement officers, including fighting birds or animals, obscene material, hazardous waste, firearms, explosives, commercial fertilizer and seed, forgery and counterfeiting devices, property held out for sale by an itinerant vendor, shellfish taken in polluted waters, and driver's licenses found to be in the possession of any person other than the licensee. Thus far, the Legislature has not acted to authorize the search and seizure of a person's bodily fluids.

Finally, it should be noted that law enforcement officers generally have been allowed by both federal and state decisional law to search a suspect incident to a lawful arrest. Indeed, in *Schmerber*, the Supreme Court of the United States, in an opinion by Justice Brennan, held that an officer who had probable cause to believe that the defendant was operating an automobile while under the influence of alcohol could constitutionally require him to submit to the withdrawal of blood by a physician in a hospital, even though the defendant objected to the procedure. *Schmerber*, 384 U.S. at 771, 86 S.Ct. at 1836, 16 L.Ed.2d at 920. The Court held that the warrant requirement was precluded by the emergent necessity to conduct the tests before the BAC was reduced by the passage of time to the point where it would constitute the destruction of evidence. *Id.* Therefore, the Court concluded "that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest." *Id.* From the point of view of the Fourth Amendment and the Four-

---

**27.** Article 10, section 2, of the Rhode Island Constitution sets forth the powers of the judicial branch of state government and provides, in relevant part:

"**Jurisdiction of supreme and inferior courts—Quorum of supreme court.**—The supreme court shall have final revisory and appellate jurisdiction upon all questions of law and equity. It shall have power to issue prerogative writs, and shall also have such other jurisdiction as may, from time to time, be prescribed by law. A majority of its judges shall always be necessary to constitute a quorum. *The inferior courts shall have such jurisdiction as may, from time to time, be prescribed by law.*" (Emphasis added.)

teenth Amendment, such an intrusion even over the objection of the defendant was not constitutionally forbidden. The Court did not discuss or consider whether a warrant would have been available under California law.

However, here we are confronted with the question of whether an officer, in reliance upon a warrant that was not specifically authorized by statute, may, under Rhode Island law, obtain a blood sample after the suspect has refused to consent to a chemical test. Assuming that *Schmerber* still represents the constitutional law of the United States, the warrant in this case would have been surplusage under federal requirements if, indeed, the officer had probable cause to believe that defendant was operating under the influence of a controlled substance.

However, the Chief Justice and I are of the opinion that the absence of a statute authorizing the issuance of a search warrant to obtain a blood sample or a sample of other bodily fluids places the question of our overturning *Timms* in a totally different light. Our Legislature has chosen to construct an elaborate requirement of consent, buttressed with an equally elaborate set of admonitions around the procedure for obtaining a chemical test. These requirements, in addition to the absence of a statute specifically authorizing the issuance of a warrant to obtain such samples, leads us to conclude that *Timms* struck the appropriate balance with respect to Rhode Island law. Accordingly, we are convinced that to overrule *Timms*, as well as *St. Jean*, we would impermissibly involve ourselves in the enterprise of legislation. We would first be required to legislate the issuance of a warrant for a purpose not authorized by statute. In addition, we would be required to hold that this judicially authorized warrant would trump the various provisions set forth by the General Assembly requiring the consent of any suspect who may be subjected to a chemical test for breath, blood, or urine. Moreover, if such a test may be authorized by an officer without a warrant, is that officer also empowered to force a physician, nurse, or medical assistant to withdraw the sample against their will, in light of the fact that medical personnel are restricted by the statutes relating to a patient's confidential health care information from disclosing information without a person's consent. *See* § 5–37.3–4. Medical personnel who ignore this requirement and draw blood from an unconsenting subject at the direction of a police officer may face a civil action and, pursuant to § 5–37.3–4, possible fine and imprisonment.

Accordingly, we decline to accept the state's invitation to venture into the realm of piecemeal legislation. We are mindful that this Court previously has held that the consent requirement was designed to avoid confrontation between a suspect and an officer who might wish to require him or her to submit to a chemical test. *State v. Locke,* 418 A.2d 843 (R.I.1980). Consequently, even though the Federal Constitution may not require a warrant to authorize an officer to compel a suspect to submit to a blood test as long as the officer has probable cause to believe that the suspect was driving while impaired, a byproduct of leaving enforcement of this decision to an officer unaided by a warrant would be to create many dangerous and unintended consequences that should be dealt with and prevented by legislative enactment, not by judicial fiat. In *Schmerber,* the United States Supreme Court merely decided the lengths a state might go without violating the Federal Constitution. Therefore, the wisdom and framework for requiring tests and implementing testing procedures should properly be left to the Legislature, which as set forth in *Timms* has indicated its choice.

■ Accordingly, we conclude that § 31–27–2.1 precludes law enforcement officials from obtaining a warrant to seize blood, and further, that this prohibition in no way unconstitutionally limits the authority of the judiciary to issue warrants.

The authority to issue warrants emanates from the General Assembly, and the General Assembly has not seen fit to vest the Superior Court with that power.

## CONCLUSION

For the reasons stated herein, we answer the certified questions as follows:

1. The Chief Justice and I would answer question one in the affirmative.

2. We answer question two in the affirmative and hold that § 31–27–2.1 does preclude members of law enforcement from obtaining a judicially authorized search warrant to seize blood from a defendant who has refused to consent to such test.

3. We answer question three in the negative, because the judicial power to issue warrants is derived from the General Assembly, and the General Assembly has not vested the District Court or Superior Court with the power to issue a search warrant for the seizure of blood.

Justice FLANDERS concurs in our answer in question two and question three which set forth the judgment of the Court.

WEISBERGER, Chief Justice, concurring.

I concur completely in the opinion written by Justice Goldberg, not only in respect to her conclusions, but also in respect to the rationale of that opinion.

I write separately only to indicate that our dissenting justices have expended more than twenty pages of enunciation of policy that could have been implemented by less than a paragraph of legislation had the General Assembly been inclined so to provide.

I do not disagree that sound policy would support legislation that would enable a police officer to obtain a warrant for the production of a blood sample in the event that he or she had probable cause to believe that a suspect committed a felony

by taking the life or seriously injuring a human being while under the influence of alcohol or a controlled substance. The sad fact is that G.L.1956 § 12–5–2 simply does not authorize the issuance of such a warrant.

The dissenters eloquently argue that common sense should dictate that the consent of one who has committed the crime of driving under the influence of drugs or a controlled substance resulting in death should not be required as a condition precedent to obtaining a blood sample by a physician or qualified medical technician for the purpose of testing the content of that blood. I would agree that common sense would support such an outcome. However, the incontrovertible truth is that our felony statutes, G.L.1956 §§ 31–27–1 and 31–27–2.2, do not contain such a statement. Further, the provisions of G.L.1956 § 5–37.3–4 specifically prohibit the release of such medical health care information in the absence of written consent of the patient or his or her authorize representative. A close reading of the exceptions provided under § 5–37.3–4(b) discloses no provisions for release of the results of a blood test obtained pursuant to a judicial warrant.

I sincerely wish that our statutory provisions in chapter 27 of title 31 and in chapter 37.3 of title 5 would authorize the obtaining of a blood sample or other chemical tests of breath and body fluids when probable cause exists to believe that a suspect has committed vehicular homicide. The plain fact is that our statutes make no such provision. All of the oratory in the dissent cannot amend these statutes to achieve the desired purpose. Only the General Assembly has this power.

I believe that the statements of policy and reason set forth in the dissent have considerable merit. However, these statements should be addressed to the Legislature and not to this Court. An examination of the relevant statutes indicates that there is a significant tension evidenced by our statutory structure between the objec-

tive of protecting the confidentiality of persons accused of a crime (particularly matters relating to the disclosure of health care information or requiring such person to submit to chemical tests of breath and bodily fluids), and the desire to prosecute for serious criminal offenses. The result is, as we stated fourteen years ago in *State v. Timms*, 505 A.2d 1132, 1135–36 (R.I. 1986), that no person accused of driving so as to endanger resulting in death, wherein the alcoholic content of the person's blood would be a relevant factor in determining his or her ability to drive safely could be subjected to a blood test without that person's consent. I agree that the feeble civil remedy provided for refusing the chemical test is an insufficient disincentive for such refusal when one is accused of vehicular homicide. *See* § 31–27–2.1. I would urge the General Assembly to amend the law so that it might read as the dissenters would have it read.

However, I do not believe that the members of this Court have the power to torture the language of these various relevant statutes in order to bring about the desired result. I would, therefore, respectfully ask the members of the General Assembly to review these statutes in the light of *State v. DiCicco*, 707 A.2d 251 (R.I. 1998); *State v. Timms, supra;* and *State v. St. Jean*, 554 A.2d 206 (R.I.1989), as well as the various opinions in this case, and enact into law the suggestions contained in the dissenting opinion. I would certainly applaud such action, but do not have the power by decisional legerdemain to amend the existing statutes so as to achieve the dissenters' objective.

FLANDERS, J., concurring in part and dissenting in part.

I concur with that portion of Justice Goldberg's opinion that concludes that G.L.1956 § 31–27–2.1 bars police officers from obtaining a search warrant that would force a person suspected of driving under the influence, death resulting, to submit to a blood test for the presence of alcohol after that person has refused to consent to such testing upon the request of a law enforcement officer to do so. Section 31–27–2.1(a) provides, in pertinent part, that in these circumstances no blood test shall be given to a suspect unless he or she consents thereto ("none shall be given"). I do not believe that this restriction on police-initiated blood testing of motorists, in the absence of consent, pertains solely to situations involving mere misdemeanor charges of driving under the influence. Rather, I conclude that the Legislature meant what it said and did not intend to permit the police to circumvent the various procedural and other safeguards for such testing that are set forth in § 31–27–2 by allowing the police to obtain a search warrant authorizing such testing despite the suspect's refusal to consent to the officer's request that he or she voluntarily submit to such testing. Moreover, for the reasons indicated in Justice Goldberg's opinion, I do not believe that this legislative limitation on the ability of the police to obtain search warrants violates any applicable separation-of-powers principles.

I also agree, however, with Justice Bourcier's analysis of the scope of § 31–27–2(a). But for the Legislature's enactment of § 31–27–2.1 and this Court's decision in *State v. Timms*, 505 A.2d 1132 (R.I.1986) and its progeny, I would be inclined to agree that the consent and testing provisions of § 31–27–2 are, by their terms, applicable only in misdemeanor prosecutions for driving under the influence, and have no application whatsoever to felony prosecutions for driving under the influence, death resulting. But, in my judgment, this issue becomes a moot point because I also agree that § 31–27–2.1(a)'s "none shall be given" language is not so limited, on its face, to license-revocation proceedings or to misdemeanor prosecutions. Rather, according to *State v. Berker*, 120 R.I. 849, 391 A.2d 107 (1978), it is § 31–27–2.1(a)'s implied-consent provisions that are limited to license-revocation proceedings; but the statute's mandate of no

blood testing without consent ("none shall be given") applies whenever a motorist has refused to submit to the § 31–27–2 tests—regardless of whether the police ultimately prefer any charges or initiate any proceedings against the motorist who has refused to submit to the requested testing. Thus, § 31–27–2.1(a) indicates that no blood testing shall occur if consent is not obtained from "[a]ny person who operates a motor vehicle within this state [who] *** having been placed under arrest refuses upon the request of a law enforcement officer to submit to the tests, as provided in § 31–27–2." In that case, "none shall be given"—irrespective of whatever particular misdemeanor or felony charge(s) may or may not eventuate in any given case.[28] Because § 31–27–2.1 is more specific than G.L.1956 §§ 12–5–1 and 12–5–2 (the general statutes authorizing the issuance of search warrants), I construe § 31–27–2.1(a)'s "none shall be given" directive as constituting an exception to the more general search-warrant statutes—assuming, without deciding, that a warrant authorizing the seizure of a person's blood to test for the alcohol content therein would even fall within the scope of that statute, given its apparent property-seizure limitations. Although this issue is not before us and has not been properly presented for our decision, it is one that, as Justice Goldberg's opinion elucidates, raises very difficult and troubling questions about the propriety of issuing search warrants at all to seize a person's blood.

Moreover, there is a further reason why the use of a search warrant to compel a suspect to submit to a blood test against his or her will may be problematic under our state Constitution. Under the Fifth Amendment to the United States Constitu-

tion, "[n]o person *** shall be compelled in any criminal case to be a witness against himself ***." The comparable provision in our state Constitution, however, contains different and potentially more expansive wording: article 1, section 13, of the Rhode Island Constitution entitled "Self-crimination," provides that "No person in a court of common law shall be compelled to give self-criminating evidence." Thus, while the Fifth Amendment is limited to a prohibition against compelling persons in any criminal case to be a witness against themselves, the bar against compulsory self-incrimination in Rhode Island's Declaration of Rights arguably provides broader protection by precluding the government not just from compelling people to be witnesses against themselves but also from compelling them "to give self-criminating evidence." R.I. Const. art. 1, sec. 13. *Cf. Commonwealth v. Mavredakis*, 430 Mass. 848, 725 N.E.2d 169, 178 (2000) (comparing the textual differences between Massachusetts Declaration of Rights, art. 12, which states "No subject shall *** be compelled to accuse, or furnish evidence against himself," and the Fifth Amendment, and noting that "[t]he text of art. 12, as it relates to self-incrimination, is broader than the Fifth Amendment," citing *Opinion of the Justices*, 412 Mass. 1201, 591 N.E.2d 1073 (1992), in which the Supreme Judicial Court advised the Massachusetts Senate that admitting evidence of a defendant's refusal to consent to a breathalyzer test at a criminal trial would violate art. 12, in contradiction to the United States Supreme Court's decision in *South Dakota v. Neville*, 459 U.S. 553, 564, 103 S.Ct. 916, 923, 74 L.Ed.2d 748, 759 (1983)).

Although previous Rhode Island judicial decisions have refused to differentiate be-

---

**28.** But note that G.L.1956 § 31–27–2.1(a)'s "none shall be given" mandate is only triggered if three factual preconditions are satisfied: (1) the motorist is placed under arrest; (2) the law enforcement officer requests the motorist to submit to any of the § 31–27–2 tests; and (3) the motorist refuses to do so. In this case, all of these factual circumstances are present. Thus, we have no occasion to

opine on whether, for example, a nonconsensual seizure of blood incident to a lawful arrest would be valid under Rhode Island law if the law enforcement officer did not first request the motorist to consent to the § 31–27–2 tests but simply arranged for a sample of the motorist's blood to be drawn for testing purposes with or without the motorist's cooperation.

tween the standard to be applied under article 1, section 13, and the one that applies under the Fifth Amendment to the Federal Constitution, *see, e.g., State v. Bertram,* 591 A.2d 14, 21–22 (R.I.1991) (refusing to deviate from the Fifth Amendment test when analyzing the validity of compelled handwriting exemplars under article 1, section 13, of the Rhode Island Constitution), no Rhode Island Supreme Court decision yet has examined the potentially critical difference in the wording of these two constitutional provisions and its arguable significance in cases in which the government requires a suspect "to give self-criminating evidence" that is not in itself of a communicative or a testimonial nature. R.I. Const. art. 1, sec. 13.

In other words, unlike the Federal Constitution, the Rhode Island Constitution does not seem to incorporate, by its terms, an express testimonial or a communicative limitation on the compelled giving of evidence by a person. Thus, the possibility exists that the framers drafted article 1, section 13, in such a manner as to provide for a broader ban on the government's compelling of self-incriminatory acts than the Fifth Amendment analogue to the United States Constitution (at least as that clause has been construed most recently by a majority of the United States Supreme Court). For example, such acts as forcing suspects and witnesses to give their blood, handwriting exemplars, DNA samples, fingerprints, or documents, or otherwise to assist the prosecution "in a court of common law" by the compulsory giving of evidence of a "self-criminating" nature may fall within the literal terms of article 1, section 13, regardless of whether the compelled giving of such evidence is "testimonial" in nature. *See, e.g., Doe v. United States,* 487 U.S. 201, 108 S.Ct. 2341, 101 L.Ed.2d 184 (1988).

Moreover, in a recent concurring opinion authored by Justice Thomas (joined by Justice Scalia), in the United States Supreme Court case of *United States v. Hubbell,* 530 U.S. 27, ——, 120 S.Ct. 2037, 2050–54, 147 L.Ed.2d 24, 43–48 (2000), Justice Thomas noted that, historically, "substantial support [exists] for the view that the term 'witness' [in the Fifth Amendment] meant a person who gives or furnishes evidence, a broader meaning than that which our case law currently ascribes to the term." *Id.* at ——, 120 S.Ct. at 2050, 147 L.Ed.2d at 44. Justice Thomas specifically observed that during the debate over the ratification of the Federal Constitution Rhode Island was one of four states that proposed a bill of rights that would grant citizens a right against any governmental compulsion "to give evidence"—regardless of whether, in doing so, the person would "be a witness" against himself or herself. *Id.* at ——, 120 S.Ct. at 2052, 147 L.Ed.2d at 46 (citing the Rhode Island Proposal of May 29, 1790). *Compare Boyd v. United States,* 116 U.S. 616, 634–35, 6 S.Ct. 524, 534–35, 29 L.Ed. 746, 752 (1886) (holding that the Fifth Amendment protected a suspect against the compelled production of books and papers), *with Fisher v. United States,* 425 U.S. 391, 408, 96 S.Ct. 1569, 1579, 48 L.Ed.2d 39, 54 (1976) (permitting the government to force a person to furnish incriminating documentary evidence and protecting only the "testimonial" aspects of that transfer); *but see Hubbell,* 530 U.S. at ——, 120 S.Ct. at 2048, 147 L.Ed.2d at 41–42 (barring government from indicting an immunized witness based upon the documents produced by the witness in response to a subpoena *duces tecum* ).

In any event, in a case properly preserving this issue, I would remain open to the argument that the Rhode Island Constitution (article 1, section 13) should be construed more broadly than the Federal Constitution in this respect because of the Rhode Island framers' failure to adopt the Federal Constitution's "witness against himself" language. U.S. Const.Amend. V. Arguably, the broader terminology of the Rhode Island Constitution—precluding a person from being compelled "to give self-criminating evidence"—means that no

"testimonial" or "communicative" limitation exists whenever the government attempts to compel a person to provide it with "self-criminating evidence," for use "in a court of common law." R.I. Const. art. 1, sec. 13. Under this interpretation, the government could be barred from compelling suspects to give handwriting exemplars, blood, fingerprints, DNA samples, or other such "self-criminating" evidence if they objected to doing so. But because this issue is not now before us, I would leave this question for this Court to address in another case that raises it. Suffice it to say for now that, in cases like this one, construing § 31–27–2.1 to preclude nonconsensual seizures of a person's blood for drug-testing purposes avoids the necessity for us to decide the difficult constitutional issues described above—as well as the other legal and pragmatic problems alluded to in Justice Goldberg's opinion—if the police were entitled to compel a person to give them a blood sample after the person has refused a police officer's request to submit to such testing voluntarily and after the police have sought and obtained a search warrant for that purpose.

For these reasons, I would answer question one in the negative, question two in the affirmative, and question three in the negative.

BOURCIER, Justice, with whom Justice LEDERBERG joins, dissenting.

I would respond in the negative to questions one and two and need not answer the third question that has been certified to us from the Superior Court for the reasons hereinafter set out.

I

Certified Question 1

"In view of *State v. Timms*, 505 A.2d 1132 (R.I.1986), should R.I.Gen.Laws § 31–27–2(c) be interpreted to preclude, in a case involving an alleged violation of R.I.Gen.Laws § 31–27–2.2 (driving under the influence, death resulting), the

admission at trial of the results of breathalyzer, blood or urine tests at trial, when the breath, blood or urine samples were seized without the defendant's consent and pursuant to a judicially authorized search warrant?"

In a felony prosecution for driving under the influence of liquor or drugs, death resulting, pursuant to G.L.1956 § 31–27–2.2, I would not bar the admission of test results derived from the chemical analysis of a defendant's breath, blood or urine when such samples were seized without a defendant's consent but had been taken pursuant to a judicially authorized search warrant. I would not bar admission of that evidence based on the questionable dicta found in *State v. Timms*, 505 A.2d 1132 (R.I.1986), dicta that was later unceremoniously canonized in *State v. St. Jean*, 554 A.2d 206, 211 (R.I.1989), without any mention whatsoever of *Timms*, and without the benefit of any meaningful judicial analysis. I read the plain language of § 31–27–2(c) as only barring the admission of nonconsensual chemical test results in misdemeanor prosecutions under subsection (a) in that particular statute.

First, the *Timms* case. That case, simply put, created bad law out of mere dicta. Timms, it should be noted, had been charged only with two counts of driving so as to endanger, death resulting, in violation of § 31–27–1. *Id.* at 1133. Nothing in that particular statutory offense required any proof that Timms had operated her vehicle while under-the-influence of any intoxicating liquor or drugs. Section 31–27–1 requires proof only that an operator has operated his or her vehicle in reckless disregard of the safety of others. *See State v. Bettencourt*, 723 A.2d 1101, 1106 (R.I.1999). Following her Superior Court jury trial and conviction, Timms challenged that conviction in her appeal to this Court.

In her appeal, she questioned only a single evidentiary trial ruling made by the trial justice. That evidentiary challenge concerned only whether the two police de-

partment consent forms that she earlier had signed, consenting to the taking of a sample of her blood for chemical analysis, sufficiently complied with the particular consent form prescribed in G.L.1956, § 5–37.3–4 of the Confidentiality of Health Care Information Act. *Timms*, 505 A.2d at 1135. Thus, her sole challenge to her conviction concerned only the admissibility of her medical record in light of the requirements of the Confidentiality of Health Care Information Act. Therefore, nothing in Timms's appeal called for the Court in that case to undertake its hypothetical analysis concerning the issue of consent as it applied to the taking and subsequent testing of her blood. There was neither logical reason nor relevant purpose for this Court in that appeal to have indulged in speculation about whether, *if* Timms had been prosecuted for violation of either § 31–27–2 or § 31–27–2.2 instead of § 31–27–1, that her prior consent to the taking of a sample of her blood in either of those particular prosecutions would have been required. It is important to note that a defendant's required prior consent to the chemical analysis of a sample of his or her blood, breath or urine is provided for only in § 31–27–2. That statute, by its very wording, applies only to misdemeanor prosecutions for violation of § 31–27–2(a) and was never intended by the Legislature to be impliedly applicable also in felony prosecutions pursuant to § 31–27–1 (driving so as to endanger), or § 31–27–2.2 (driving under the influence, death resulting). Thus, consideration of those statutes was not relevant to the single appellate issue that had been raised by Timms in her appeal and was not in any way necessary to the determination of that issue in her appeal.

As I read *Timms*, it becomes obvious that its dicta misadventure was prompted by the Court's obvious failure to comprehend why the Legislature specifically provided for a suspected driver's prior consent to the chemical testing of his or her breath, blood or urine only in a misdemeanor § 31–27–2 prosecution, and did not

provide for that same prior consent and testing in a felony § 31–27–1 prosecution for reckless driving, serious injury resulting, or in a § 31–27–2.2 driving under the influence, death resulting prosecution. That perplexity is evident from the following excerpt from *Timms*:

> "Both statutes concern the same subject matter, namely driving in a manner so as to threaten public safety. Furthermore, in addition to the already-enacted §§ 31–27–1 and 31–27–2, the Legislature subsequently created § 31–27–2.2, 'Driving under the influence of liquor or drugs, resulting in death.' The consent safeguards in § 31–27–2.2 are also not explicitly in its text, yet the Legislature would not have enacted two separate driving-under-the-influence sections, intending that the consent safeguards apply only to one." *Timms*, 505 A.2d at 1136.

That comment, I believe, exposes the *Timms* Court's failure to appreciate that the chemical testing of a suspected operator's breath, blood or urine was "designed deliberately to facilitate [a defendant's] conviction, [and] not to shield him" from prosecution and conviction. *White v. Maryland*, 89 Md.App. 590, 598 A.2d 1208, 1211 (1991) (quoting *Brice v. State*, 71 Md.App. 563, 526 A.2d 647, 649 (1987)). Indeed, the *Timms* Court actually and repeatedly refers to the "consent safeguards" as being intended to protect the suspected drunk driver. Such references reflect, I believe, that the *Timms* Court misapprehended for whom the alleged statutory "consent safeguards" were intended, a misapprehension that today only two justices of this Court continue to espouse.

I believe that this Court should no longer regard *Timms* as valid judicial precedent, and that *Timms* should be reversed. Justices Lederberg and Flanders join with me in that regard, and thus, on this matter, as we constitute a majority of this Court, *State v. Timms* is reversed. The

reversal of *Timms* does not, however, signal the end of this Court's response to the first certified question posed to us. There remains for consideration, the ancillary inquiry posed to us in that question concerning whether, in a driving under the influence, death resulting prosecution, pursuant to G.L. § 31–27–2.2, the test results of a defendant's breath, blood, or urine sample taken without a defendant's prior consent, but taken pursuant to a judicially authorized search warrant, later are admissible as evidence in that defendant's trial.

■ With regard to this Court's response to that portion of the inquiry posed to us in Certified Question One, Justice Lederberg and I would respond that chemical test results, derived from a sample of a non-consenting suspected operator's breath, blood or urine, taken pursuant to a judicially authorized search warrant, would be admissible as evidence in a felony prosecution for driving under the influence, death resulting, pursuant to § 31–27–2.2. In that regard, Justice Goldberg and the Chief Justice conclude that, in view of *Timms*, § 31–27–2(c) does not permit, in a case alleging a violation of § 37–27–2.2 (driving under the influence, death resulting) the admission at trial of the results of breathalyzer, blood or urine tests, when the breath, blood, or urine samples were seized without the defendant's consent pursuant to a judicially authorized search warrant. Justice Flanders concludes that § 31–27–2(c) applies only to misdemeanor prosecutions; therefore, he concurs with Justice Lederberg and myself that *Timms* does not bar the admission at trial of the results of breathalyzer, blood, or urine tests that were seized without the defendant's consent via a search warrant. However, he believes that § 31–27–2.1 does bar any such testing or seizure of the defendant's blood, breath or urine without a defendant's prior consent.

I believe, as was said in *State v. Bruskie*, 536 A.2d 522, 524 (R.I.1988), that the "goal of legislation against drunken driving \*\*\* is to reduce the carnage occurring on our highways attributable to persons who imbibe alcohol and then drive[,]" and the objective of those statutes is "to remove from the highway drivers who by drinking become a menace to themselves and to the public."

This Court has often proclaimed that when interpreting legislative enactments, it does so with a view towards carrying out the intent and purpose of the particular legislation, and in doing so, gives the legislation "what appears to be the meaning that is most consistent with its \*\*\* obvious purpose." *Kirby v. Planning Board of Review of Middletown*, 634 A.2d 285, 290 (R.I.1993) (quoting *Zannelli v. Di Sandro*, 84 R.I. 76, 81, 121 A.2d 652, 655 (1956)). *See also State ex rel. Town of Middletown v. Anthony*, 713 A.2d 207, 210 (R.I.1998).

I believe that the majority's response today, barring the chemical test results of a sample of a non-consenting suspected alcohol- or drug–impaired drivers' breath, blood or urine in § 31–27–1 and § 31–27–2.2 felony prosecutions, serves to ignore and frustrate the Legislature's clearly expressed intent and mandate found in § 31–27–2. That statute, § 31–27–2, only requires a suspected operator's prior consent to chemical testing in misdemeanor no injury-fender-bender prosecutions, and not in felony prosecutions, pursuant to § 31–27–1 and § 31–27–2.2. Nothing can be clearer than the specific wording employed by the Legislature when enacting § 31–27–2(b)(1). That section says loud and clear that its prior consent to chemical testing requirement applies only to "[a]ny person charged under subsection (a)" of § 31–27–2, and subsection (a) specifically concerns only misdemeanor prosecutions.[29] It states:

> "Any person charged under subsection (a) of this section whose blood alcohol concentration is eight one-hundredths of one

**29.** In July, 2000, the Legislature amended § 31–27–2. Subsection (b)(1) now reads:

"31–27–2. **Driving under influence of liquor or drugs.**—(a) Whoever operates or otherwise drives any vehicle in the state while under the influence of any intoxicating liquor, drugs, toluene, or any controlled substance as defined in chapter 28 of title 21, or any combination thereof, shall be guilty of a misdemeanor and shall be punished as provided in subsection (d) of this section.

(b)(1) Any person charged *under subsection (a) of this section* whose blood alcohol concentration is one-tenth of one percent (.1%) or more by weight as shown by a chemical analysis of a blood, breath, or urine sample shall be guilty of violating subsection (a) of this section. *** (emphasis added)

(2) ***

(c) *In any criminal prosecution for a violation of subsection (a) of this section,* evidence as to the amount of intoxicating liquor, toluene, or any controlled substance as defined in chapter 28 of title 21, or any combination thereof in

> percent (.08%) or more by weight as shown by a chemical analysis of a blood, breath, or urine sample shall be guilty of violating subsection (a) of this section." P.L.2000, ch. 264.

**30.** In *State v. Robarge*, 35 Conn.Supp. 511, 391 A.2d 184, 185 (App.Ct.1977), the Connecticut Appellate Court was confronted with the same prior consent issue under statutes almost identical to ours. The court there, correctly in my opinion, concluded that the failure to meet the statutory conditions for consent necessary for the admissibility of test samples in prosecutions under Connecticut General Statutes Sec. 14–227a(b) (operation of a motor vehicle while under the influence of intoxicating liquor or drugs) did not bar admission of blood sample test results in a prosecution under Sec. 53a–58a (negligent homicide with a motor vehicle). The court reasoned that to conclude otherwise would be wholly unsound in view of the clear language in Sec. 14–227a(b), applying the consent requirement only to violations of Sec. 14–227a(a), the general driving-under-the-influence statute. *Id.* The court there said:

> "The claim of the defendant that the failure to meet the requirements of § 14–227a(b) rendered the blood test results inadmissible is wholly unsound in view of the

the defendant's blood at the time alleged as shown by a chemical analysis of the defendant's breath, blood, or urine or other bodily substance shall be admissible and competent, provided that evidence is presented that the following conditions have been complied with:

(1) The defendant has consented to the taking of the test upon which the analysis is made. Evidence that the defendant had refused to submit to the test shall not be admissible unless the defendant elects to testify." (Emphasis added.) [30]

I am unable to join with the majority of this Court who opine that chemical test result evidence of a defendant driver's breath, blood or urine, taken following an incident in which that defendant's vehicle has killed or permanently crippled some innocent person on our public highways, should be inadmissible and barred as evidence of impairment in the trial of the death-causing driver. The majority's

> introductory clause, which reads '[i]n any criminal prosecution for a violation of subsection (a) of this section ***.' It is as clear as words can make it that the requirements of subsection (b) pertain only to prosecutions for the operation of a motor vehicle while under the influence of intoxicating liquor or drugs in violation of § 14–227a(a). The defendant's elaborate argument that the law should be otherwise should more appropriately be addressed to the legislature." *Robarge*, 391 A.2d at 185.
>
> Later that year, the Connecticut Supreme Court rejected the argument of a defendant charged with misconduct with a motor vehicle where he asserted that his blood sample should have been excluded because the taking and testing of the sample did not meet the consent requirements outlined in § 14–227a(b). *State v. Singleton*, 174 Conn. 112, 384 A.2d 334, 336 (1977), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1425, 59 L.Ed.2d 635 (1979). That court squarely held that "[b]y its express terms, the procedural [consent] requirements of [§ 14–227a(b) ] apply to any criminal prosecution for a violation of § 14–227a(a)—the offense of operating a motor vehicle while under the influence of intoxicating liquor or drugs or both" and not to other vehicular violations such as the one with which defendant was charged. *Id.*

"bar-all-prohibit-all" position serves but one senseless purpose, namely, to shackle our state prosecutors in their attempt to prosecute and convict defendants charged with felony violations of § 31–27–1 and § 31–27–2.2. It also serves, sub silencio, actually to revive and reinstate the *Timms* dicta rule, that for the past fourteen years only has coddled and insulated alcohol- and drug-impaired drivers from felony prosecution and conviction. Pursuant to what the majority does in this proceeding, those alcohol- or drug-impaired drivers who kill and maim innocent people can continue to escape felony prosecution simply by refusing to consent to an officer's request to take a breath, blood or urine sample. In that event, the suspected felon then will be charged with failing to consent to give a breath, blood or urine sample for testing, a misdemeanor, the penalty for which will be a short license suspension and a small fine. That is a far cry from what the Legislature intended when it enacted stiff 10–year jail sentences for drivers convicted for violations of § 31–27–1 and for no less than 5 and up to 15 years for convictions under § 31–27–2.2.[31]

In his concurring opinion, the Chief Justice candidly acknowledges "that common sense should dictate that the consent of one who has committed the crime of driving under the influence of drugs or a controlled substance resulting in death should not be required as a condition precedent to obtaining a blood sample by a physician or qualified medical technician for the purpose of testing." However, he then retreats from that position by adding that the "incontrovertible truth is that our felony statutes, § 31–27–1 and § 31–27–2.2, do not contain such a statement." Indeed that is true, but is nothing more than a self-created truism. The undeniable truth

is that within those very same statutes as enacted by the General Assembly there is absolutely no language providing for any condition precedent to obtaining a suspected blood sample and absolutely no language requiring a suspected driver's prior consent for the taking of a sample of his or her blood, breath or urine for chemical testing purposes. Instead, and in fact, it was this Court, acting on its own initiative in *Timms*, that chose to judicially write into those statutes the very consent requirements that now plague us. Thus, all that really is needed now to correct that problem is for this Court to carry out the effect of our reversal today of *Timms*, and to do away with the judicially-created prior consent requirements that this Court created in that case. No legislation actually is necessary. This Court can simply take out what it put in, and without any further quibbling, the law would then be exactly what the Chief Justice concedes that it should be. In short, this Court, having created the suspected driver's prior consent edict, now can—and should—rescind what it created.

Justice Goldberg's opinion, in which the Chief Justice joins, appears to ignore the troubling implications that will flow from the opinion in response to Certified Question One, and seeks to justify their prior consent viewpoint in all cases with the aid of the Latin phrase *"noscitur a sociis,"* [32] as well as by citing to what little remains of *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). They embellish their *Rochin* cite with misplaced compassionate concern for those alcohol- or drug-impaired drivers who kill innocent people on our highways and who cause the carnage that our Legislature so deplores. They stress in their concern that even the

---

31. Indeed, the New Hampshire Supreme Court has held that a three-year license suspension could not be considered "punishment" sufficient to invoke a double jeopardy application. *State v. Liakos*, 142 N.H. 726, 709 A.2d 187, 191 (1998).

32. *Noscitur a sociis* is defined as "[a] canon of construction holding that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." Blacks Law Dictionary 1084 (7th ed.1999). Its use is somewhat paradoxical because they contend there is nothing unclear in § 31–27–2.2.

taking of a small sample of breath, blood, or urine from an alcohol- or drug-impaired driver would inflict a profound and lasting harm or would enhance the "real danger a cocktail of blood, needles and a resistant, intoxicated motorist presents to those who attempt to subdue the [alcohol or drug-laden] suspect in order to draw blood."

It is difficult for me to accept the opinion that *Rochin* labels the simple procedure utilized in the taking of a blood sample from a chemically-impaired driver as a sort of medieval torture concocted in some dark medieval dungeon, and which law enforcement officials should never be permitted to utilize in attempting to prosecute an alcohol- or drug-impaired driver. *Rochin*, in fact, was virtually emasculated by the United States Supreme Court less than five years after it was decided. *See Breithaupt v. Abram*, 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). What Justice Goldberg and the Chief Justice in this case today view as constituting a "cocktail of blood and needles," the United States Supreme Court in *Breithaupt* views differently:

"Modern community living requires modern scientific methods of crime detection lest the public go unprotected. The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield. The States, through safety measures, modern scientific methods, and strict enforcement of traffic laws, are using all reasonable means to make automobile driving less dangerous.

"As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road. And the more so since the test likewise may es-

tablish innocence, thus affording protection against the treachery of judgment based on one or more of the senses. Furthermore, since our criminal law is to no small extent justified by the assumption of deterrence, the individual's right to immunity from such invasion of the body as is involved in a properly safeguarded blood test is far outweighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of alcohol can often by this method be taken out of the confusion of conflicting contentions." *Id.* at 439–40, 77 S.Ct. at 412, 1 L.Ed.2d at 452–53.

The Supreme Court additionally noted that:

"due process is not measured by the yardstick of personal reaction or the sphygmogram of the most sensitive person, but by that whole community sense of 'decency and fairness' that has been woven by common experience into the fabric of acceptable conduct. It is on this bedrock that this Court has established the concept of due process. The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for marriage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors. Likewise, we note that a majority of our States have either enacted statutes in some form authorizing tests of this nature or permit findings so obtained to be admitted in evidence. We therefore conclude that a blood test taken by a skilled technician is not such 'conduct that shocks the conscience,' *Rochin, supra,* at 172[, 72 S.Ct. 205], nor such a method of obtaining evidence that it offends a 'sense of justice,' *Brown v. Mississippi,* 1936, 297 U.S. 278, 285–286, 56 S.Ct. 461, 464–465, 80 L.Ed. 682." *Brei-*

*thaupt,* 352 U.S. at 436–37, 77 S.Ct. at 410–11, 1 L.Ed.2d at 451–52.

I also question the misplaced emphasis in Justice Goldberg's opinion upon the inability of the state's appellate counsel to respond in detail to a hypothetical question posed at oral argument regarding the manner in which a suspected alcohol- or drug-impaired driver's blood sample would be taken. Appellate counsel's response, whatever it might have been, would have been of no consequence. The Legislature has long ago, proscribed the procedure to be employed in the taking of a suspected driver's blood sample. In misdemeanor prosecutions under § 31–27–2, there is a clearly established procedure set out for the chemical analysis of a suspected driver's breath, blood or urine. That procedure requires such testing to be undertaken only with equipment approved by the director of the state Department of Health, and administered "by an authorized individual." In addition, the driver who is suspected of being under the influence of alcohol or drugs must be afforded the opportunity to have an additional chemical test performed by a doctor or professional of his or her own choosing, and the officer arresting or so charging the person must notify the suspected driver of that right and afford him or her a reasonable opportunity to exercise that right. Refusal to permit that additional chemical test within a reasonable time would render inadmissible any evidence derived from the original test report.

In sum, I believe that such statutory safeguards as described above effectively answer the concerns of Justice Goldberg and the Chief Justice. They eliminate any potential risks associated with the administering of those chemical tests and further provide the suspected alcohol- or drug-impaired driver with a sufficient opportunity to take additional chemical tests in an environment and a manner substantially of his or her own choosing. While Justice Goldberg's opinion expresses remarkable and compassionate, but certainly mis-

placed, concern for the rights of alcohol and drug-laden drivers on our public highways, I cannot help but observe that the rights of the general public to travel those same roads with some modicum of safety is almost completely ignored in their calculus.

Also ignored in that calculus is the unfortunate effect their response to question one will have on all future felony prosecutions of persons charged with driving under the influence resulting in death or in severe personal injuries to some unfortunate person or persons.

In light of what a majority of this Court today opines, the Legislature's recently enacted, and much heralded, lowering of the statutory under the influence presumption from one tenth of one percent to one eighth of one percent effectively has been neutralized and essentially becomes useless. *See* P.L.2000, ch. 264. The Legislature's good intention in hopes of assisting state prosecutors to rid our highways of alcohol- and drug-impaired drivers causing the carnage on our public highways has been scuttled. All that a driver who is suspected of being impaired and who has caused a highway fatality need do to avoid conviction and imprisonment is to say "no" to an arresting officer's request that he or she consent to the giving of a sample of his or her breath, blood or urine for purposes of the chemical testing. In that event, in the absence of an available eyewitness willing to testify at trial as to the manner of the defendant's driving, the suspected alcohol- or drug-impaired driver, whose vehicle has just killed or maimed some innocent person or persons on a public highway, will avoid conviction and jail. His or her only punishment simply then will be a civil "tap on the wrist" for refusing to consent to the chemical testing procedure. That "tap on the wrist" could be but a short suspension of his or her license to operate and a small fine.

Justice Lederberg joins with me in concluding that breath, blood and urine chemical testing laws never were intended to

protect alcohol- or drug-impaired drivers whose impairment brings about and causes fatal highway collisions. We believe that such laws were intended instead to protect the public by enhancing the ability of state prosecutors to deal effectively with and to convict those particular drivers (*White*, 598 A.2d at 1211), and "to rid our highways of the drunk driving menace." *Brice*, 526 A.2d at 649.

## II

### Certified Question 2

"Does the statutory language of RIGL 31–27–2.1, the Breathalyzer Refusal Statute, preclude members of law enforcement from obtaining a judicially authorized search warrant to seize a defendant's blood for alcohol or drug testing?"

We are asked in this certified question to decide whether, in a prosecution for driving under the influence, death resulting, pursuant to § 31–27–2.2, law enforcement officers are precluded by § 31–27–2.1 from obtaining samples of a defendant's breath, blood or urine pursuant to a judicially authorized search warrant, procured pursuant to G.L. § 12–5–2, following a defendant's refusal to consent to the taking thereof.

I would respond to that question in the negative. My reason for so doing, I believe, is dictated by our long-standing rule of statutory interpretation that posits when the language of a statute is clear and unambiguous this Court should not search beyond the statute for a different meaning because "[i]n such a case the statute declares itself." *Bouchard v. Price*, 694 A.2d 670, 680 (R.I.1997) (Flanders, J., concurring). "[A] 'court is not at liberty to indulge in a presumption that the Legislature intended something more than what it actually wrote in the law.'" *In the Matter of the Civil Commitment of J.G.*, 322 N.J.Super. 309, 730 A.2d 922, 929–30 (Ct.App.Div.1999) (quoting *Graham v. City of Asbury Park*, 64 N.J.Super. 385, 165 A.2d 864 (Ct.Law.Div.1960),

*rev'd on other grounds*, 69 N.J.Super. 256, 174 A.2d 244 (Ct.App.Div.1961), *aff'd*, 37 N.J. 166, 179 A.2d 520 (1962)). Additionally, I respond to the certified question in the negative because I believe that the legislative purpose and intent that prompted the enactment of § 31–27–2.1 becomes readily apparent from its legislative origin and history, a genesis that is entirely separate and distinct from that of § 31–27–2.2.

The concept of requiring consent first was conceived in 1959 when the Legislature amended § 31–27–2. *See* P.L.1959, ch. 101, § 1. That amendment, as noted by the late Justice Kelleher in *State v. Lussier*, 511 A.2d 958, 959 (R.I.1986), allowed for the admission of evidence gained from the chemical analysis of a defendant's breath, blood or urine sample in a § 31–27–2 misdemeanor prosecution for driving under the influence. Admissibility of that evidence, however, was conditioned upon the defendant's prior consent to the chemical testing procedure, and upon additional competent evidence being presented at trial "bearing on the issue of whether the defendant was in fact under the influence of intoxicating liquor." *Id.*

The Legislature had envisioned its 1959 amendment to § 31–27–2 as a valuable means of assisting city, town and state law enforcement officials to more expeditiously dispose of the great numbers of driving-under-the-influence cases coming into the various District Courts. That legislative aim, however, fell far short of accomplishing its intended goal, which was to encourage the entry of pleas by defendants in § 31–27–2 misdemeanor prosecutions and thus avoid the necessity for a trial in those cases. However, the amendment provided no incentive for a defendant's plea because it failed to provide any penalty for refusing to consent.

Seven years later, the Legislature once again took aim at curbing the escalating carnage on our public highways caused by drivers being under the influence of alcohol or drugs. In 1966, the Legislature

1182 ■

amended chapter 27 of title 31 by adding § 31–27–2.1. *See* P.L.1966, ch. 215, § 1. That statute introduced for the first time in Rhode Island, a so-called driver's "implied consent" law, declaring that any person operating a motor vehicle within the state is deemed to have given consent to the chemical testing of his or her breath, blood or urine.

Incorporated as part of that new implied consent law were statutory presumptions that presumed a defendant to have been operating under the influence if the chemical test performed indicated the presence of .10 percent or more, by weight, of alcohol in the defendant's blood. Thus, for the first time in a prosecution for driving under the influence, that presumption alone could support a defendant's conviction pursuant to § 31–27–2. That implied consent law, and its testing procedure providing for the chemical analysis of a motorist's breath, blood or urine, only could have been enacted and intended to aid and assist in the prosecution of *misdemeanor* violations for driving under the influence, pursuant to § 31–27–2, because in 1966 there was no other then-existing statute that prohibited anyone from operating a motor vehicle in this state while under the influence of alcohol or drugs.

Thus, the Legislature, it must be noted, had a dual purpose for enacting § 31–27–2.1 in 1966. The first and primary purpose, as discussed *supra*, was to assist city, town and state police departments in more effectively and expeditiously prosecuting and disposing of misdemeanor driving under the influence cases.[33] Scores of such driving-under-the-influence cases had been constantly clogging the various District Court trial calendars, primarily because prior to the enactment of § 31–27–2.1, expert medical opinion was required to be presented in the trial of such cases to prove the "under-the-influence" element in

that misdemeanor offense and it was difficult to schedule and arrange for the presentation of that expert evidence from medical doctors. *See, e.g., State v. Poole,* 97 R.I. 215, 197 A.2d 163 (1964). By virtue of § 31–27–2.1, however, the chemical test result of a defendant's breath, blood, or urine sample was made admissible as evidence of the amount of alcohol in a defendant's blood, and if it revealed an alcohol concentration equal to or exceeding one-tenth of 1 percent, that evidence could lead to a conviction if coupled with other competent evidence of the relationship of that percentage of alcohol upon the defendant's ability to safely operate his or her vehicle.

Secondly, the Legislature anticipated that by making chemical test results admissible as proof of culpability, a defendant, after being tested and found to have the presumptive amount of alcohol in his or her blood, breath or urine, then would realize the futility and risk of insisting upon trial and incurring the attendant legal expenses and, instead, would readily opt to enter a plea. However, that legislative expectation never materialized. The Legislature in its 1966 enactment, although providing for chemical testing, made that testing procedure again subject to the defendant's prior consent to be tested and neglected to provide for any criminal or financial penalty for those suspected drivers who refused to give their consent. Thus, with little incentive to consent, few defendants did consent. From 1966 onward, all will acknowledge that driving-under-the-influence cases escalated in numbers and simply languished in the District Courts.

In 1982, the Legislature, in hopes of "beefing up" the evidentiary effect of chemical testing result evidence in § 31–27–2 misdemeanor prosecutions, and hoping to avoid unnecessary and time-consum-

---

**33.** "As chemical testing has evolved into a much relied on prosecution tool, 'implied consent' laws have likewise evolved to defeat the drunk driver's inclination to refuse to consent to such testing. Implied consent laws encourage submission to chemical testing by making automatic license suspension the cost of refusing to be tested." 1 Essen–Erwin, *Defense of Drunk Driving Cases,* § 4.01 at 4–5 (1998).

ing trials in those misdemeanor cases, amended § 31–27–2. *See* P.L.1982, ch. 176, § 1. That amendment deleted from § 31–27–2 its previous requirement for additional competent evidence of intoxication in addition to the chemical test results in prosecutions pursuant to that statute, but again did little to assist in unclogging the logjam of misdemeanor driving-under-the-influence cases then pending in the District Courts.

In May 1983, the Legislature, obviously aware of, and now more alarmed by the escalating numbers of highway deaths and serious injuries being caused by alcohol- and drug-impaired drivers on our state highways, enacted two consecutive statutory amendments aimed at finally curbing that carnage. First, P.L.1983, ch. 227, was enacted to amend section 1(b) of § 31–27–2. That amendment provided for a definite finding of intoxication and guilt if chemical test result evidence indicated a one-tenth of 1 percent or more blood alcohol concentration in a defendant's blood. The language of the amendment provided:

"Any person charged under subsection (a) of this section whose blood alcohol concentration is one-tenth of 1% or more by weight as shown by a chemical analysis of a blood, breath or urine sample shall be guilty of violating subsection (a) of this section. This provision shall not preclude a conviction based on other admissible evidence." P.L.1983, ch. 227.

As a result of P.L.1983, ch. 227, the necessity for prosecution expert testimony to establish and relate the effect of that percentage of alcohol to a defendant's ability to safely operate his or her vehicle was eliminated. The second amendment enacted in May 1983, amended § 31–27–2.1. *See* P.L.1983, ch. 228. What divides this Court today in responding to Certified Question Two is the wording employed by the Legislature in one particular sentence in that amendment. That sentence reads:

"If such a person having been placed under arrest refuses upon the request of a law enforcement officer to submit to a test, as provided in section 31–27–2, as amended, none shall be given, but an administrative judge of the division of administrative adjudication, upon receipt of a report of a law enforcement officer that he [or she] had reasonable grounds to believe the arrested person had been driving a motor vehicle within this state under the influence of intoxicating liquor, toluene, or any controlled substance as defined in chapter 21–28 of the general laws, or any combination thereof, that the person had been informed of his or her rights in accordance with Section 31–27–3, that the person had been informed of the penalties incurred as a result of noncompliance with this section, and that the person had refused to submit to the test upon the request of a law enforcement officer, shall promptly order that the person's operator's license or privilege to operate a motor vehicle in this state be immediately suspended and that the person's license be surrendered within five (5) days of notice of suspension." P.L.1983, ch. 228, § 1.

It is clear to me that the Legislature intended the implied consent law originally enacted in 1966 for use *only* in misdemeanor prosecutions for driving under the influence, pursuant to § 31–27–2. As noted *supra*, in 1966 there was no other statute that made driving while under the influence a criminal offense. So, out of necessity and plain common sense, the implied consent to chemical testing procedure enacted by the Legislature had nowhere else to go but into § 31–27–2, particularly because the Legislature in 1982, by way of P.L.1982, ch. 176, already had provided for the chemical testing procedure in misdemeanor prosecutions, pursuant to § 31–27–2.

In 1983, the Legislature enacted P.L. 1983, ch. 228, and provided for the imposition of a financial penalty upon a defendant who refused to consent to chemical testing. In doing so, I believe that the Legislature envisioned that a suspected driver more

readily would opt to consent to a chemical test rather than incur the financial penalty that would result from his or her refusal to consent. Of course, any chemical testing still would have to be performed in accordance with the testing procedure provided for in § 31–27–2.

Common sense mandates that the minor penalty that is required to be imposed upon a non-consenting defendant pursuant to § 31–27–2.1 fits only into the misdemeanor offense that is proscribed in § 31–27–2 and certainly does not fit into the felony offense proscribed in § 31–27–2.2. I am hard-pressed to believe that the majority actually can believe that a small fine and short license suspension is a fitting penalty for a defendant's refusal to consent in a driving under the influence, death resulting, felony prosecution, pursuant to § 31–27–2.2, knowing that a refusal could deprive the state of its ability to prove the

defendant's guilt, and would allow that defendant to walk free and avoid a possible fifteen-year jail sentence.

I would also point out that the Uniform Vehicle Code and Model Traffic Ordinance, prepared by the National Committee on Uniform Traffic Laws and Ordinances, specifically excludes any requirement for a defendant's prior consent to chemical testing in felony driving-under-the-influence cases in which death or serious injuries are involved. The Uniform Vehicle Code provides that a driver, when arrested in those felony cases, can be "compelled by a police officer to submit to a test or tests of driver's blood, breath or urine to determine the alcohol concentration or the presence of other drugs." Uniform Vehicle Code § 6–210—"Chemical test of drivers in serious personal injury or fatal crashes" (1992).[34]

**34.** The majority, in support of their responses to the certified questions in this proceeding, have cited to several case holdings from other jurisdictions. Those case holdings interpret only a particular statute in a particular state providing for implied consent chemical testing procedures. The statutes that were interpreted in those cases, however, are totally inapposite from G.L.1956 § 31–27–2 and § 31–27–2.1, our Rhode Island implied consent statutes.

For example, in *State v. Bellino*, 390 A.2d 1014 (Me.1978), cited in the majority opinion, the implied consent statute at issue in Maine provided for its provisions to be applicable in all criminal prosecutions for *"violation of any of the provisions"* in that state's motor vehicle code. *Id.* at 1023. The New Hampshire statute construed in *State v. Berry*, 121 N.H. 324, 428 A.2d 1250 (1981), also cited by the majority, specifically provided for its implied consent provisions to be applicable in *"any offense arising out of acts alleged to have been committed while *** driving a motor vehicle while intoxicated."* *Id.* at 1251. (Emphasis added.) Those particular implied consent statutory provisions, like the statutes at issue in each of the other cases cited in the majority opinion, are totally different from each other and also completely different and distinguishable from our Rhode Island statute. The plain language of § 31–27–2 specifically: makes chemical testing procedures applicable only in "any criminal prosecution for a

violation of subsection (a)" (*see* § 31–27–2(c)); pertains only to misdemeanor driving-under-the-influence violations (*see* § 31–27–2(b)(2)); provides that the chemical testing procedure set out in § 31–27–2 pertains only to "any person charged under subsection (a)" (*see* § 31–27–2(b)(1)).

To realize the uniqueness of our Rhode Island statute, one need only to review the comprehensive analysis of the various implied consent statutes from each of the fifty states that is provided in the statutory appendix section in Volume 4 of the treatise by Essen–Erwin, *Defense of Drunk Driving Cases* (2000). That statutory review discloses that some states, such as Arizona, have implied consent statutes that are made applicable in any offense arising out of acts alleged to be in violation of the Motor Vehicle Code. In those states, if a defendant refuses to consent to chemical testing, no tests can be undertaken except pursuant to a search warrant. That statutory review also discloses that in some other states, implied consent provisions are by specific statutory mandate made applicable in all motor vehicle code violation prosecutions in which liquor or drugs are alleged to be involved. In yet others states, the implied consent statutes are restricted to misdemeanor prosecutions only, but again, one must be careful to note that in Maryland, for example (cited by the majority), the crimes of "manslaughter by motor vehicle" and "homicide by motor vehicle" are

I conclude from the legislative history surrounding § 31–27–1 (driving so as to endanger, death resulting); § 31–27–2 (driving under the influence—misdemeanor); § 31–27–2.1 (refusal to submit to chemical test); § 31–27–2.2 (driving under the influence of liquor or drugs resulting in death); and § 31–27–2.6 (driving under the influence of liquor or drugs, resulting in serious bodily injury), that the Legislature intended to treat the alcohol- or drug-impaired driver who had just killed and/or permanently maimed some innocent person on a public highway quite differently than a misdemeanor driving-under-the-influence defendant, charged simply with erratic driving or who had been involved in a minor fender-bender collision involving no death or injuries.

In the usual run-of-the-mill misdemeanor case, pursuant to § 31–27–2(a), the Legislature never intended to subject those hundreds of suspected drivers, who annually are charged, to costly and time consuming chemical testing without first giving their consent. The wording employed in § 31–27–2.1, that "none shall be given," was only intended to preclude any such chemical testing in those misdemeanor prosecutions, even if attempted pursuant to a judicially authorized search warrant. Like the Uniform Vehicle Code, I believe, however, that § 31–27–2.1 has no application to felony prosecutions for driving-under-the-influence in which death or serious injuries have been inflicted. Had the Legislature ever intended for § 31–27–2.1 to be applicable in those felony statutes, it

certainly knew how to do so when enacting those felony statutes, yet it did not do so. This Court should not read into or judicially legislate into those statutes what the Legislature never intended. *See Lopes v. Phillips*, 680 A.2d 65, 69 (R.I.1996); *Universal Winding Co. v. Parks*, 88 R.I. 384, 391, 148 A.2d 755, 759 (1959).

As Justice Sutherland in *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 404, 57 S.Ct. 578, 587, 81 L.Ed. 703, 715 (1937), aptly noted, "[t]he judicial function is that of interpretation; it does not include the power of amendment under the guise of interpretation ." Justice Flanders, writing along similar lines some time ago in his dissent in *Kaya v. Partington*, 681 A.2d 256 (R.I.1996), observed what I believe bears repetition in this case. He said:

> "[T]he reality is, when, as here, a statute is silent on the subject at issue, we judges have absolutely no clue about what result the Legislature would have intended had it ever considered the question presented, especially when we depart from the text of a statute and attempt to find some hidden legislative design or intent that answers a problem not resolved by what the Legislature actually said." *Id.* at 264.

He further explained:

> " 'For purposes of judicial enforcement, the 'policy' of a statute should be drawn out of its terms, as nourished by their proper environment, and not, like nitrogen, out of the air.' *** Our goal is to construe the statute as it is written and

deemed misdemeanors. *See Loscomb v. State*, 45 Md.App. 598, 416 A.2d 1276 (1980). Further, it should be noted that many states, following the Uniform Vehicle Code, have statutes providing that their implied consent provisions are not applicable in under the influence felony death and serious injury prosecutions, and in those instances, chemical testing procedures can be compelled by the arresting officials. *See, e.g., Vermont Statutes Ann.* title 23, ch. 13, §§ 1201(c) and 1202(f) (1999).

The conclusion that one must inevitably draw after reviewing the various implied consent statutes enacted by each of the fifty

states is that generalizations are virtually impossible to arrive at because each state statute has its own unique virtues and faults. *See generally* Annotation, Vitauts M. Gulbis, *Admissibility in Criminal Case of Blood–Alcohol Test Where Blood was Taken Despite Defendant's Objection or Refusal to Submit to Test*, 14 A.L.R.4th 690 (1982). Our Rhode Island statute therefore must be interpreted as written, and applied as intended by the Legislature, namely to assist in the prosecution of alcohol- and drug-impaired motor vehicle operators, and not as a statutory shield to protect them from prosecution.

not to divine sound public policy out of legislative silence, references to imagined legislative intentions, or our own predilections. As Justice Frankfurter once warned, 'The search for significance in the silence of [the Legislature] is too often the pursuit of a mirage. We must be wary against interpolating our notions of policy in the interstices of legislative provisions.'

"The reason to be on guard is that when legislative silence is confronted, the temptation is omnipresent for *** the court to intrude its own preferred policies into the law under the euphemistic banner of 'filling in a legislative gap' or 'interstitial' lawmaking." *Kaya*, 681 A.2d at 267–68.

Here, it is beyond dispute that § 31–27–1 and § 31–27–2.2 are "legislatively silent" about whether a defendant in a felony prosecution pursuant to those statutes may refuse to consent to a chemical testing request—or in the case of a refusal—whether that test can be compelled by a judicially authorized search warrant. Accordingly, in the absence of any such prohibiting language in § 31–27–1 and § 31–27–2.2, I believe that, pursuant to a judicially authorized search warrant, the state should be permitted to take a breath, blood or urine sample for purposes of chemical testing when a defendant, who is charged with a violation of either of those felony statutes, refuses to comply with a request for the taking and testing thereof.

Justice Lederberg concurs with me in the above and we would respond in the negative to Certified Question Two.

### III

#### Certified Question 3

"If R.I.G.L. § 31–27–2.1 does preclude law enforcement from obtaining a search warrant, is this an unconstitutional limitation on the judicial authority to issue search warrants as provided in Article 5 of the Rhode Island Constitution and Rhode Island General Laws 12–5–1?"

In light of my responses proffered to Certified Questions One and Two, any response to question three becomes unnecessary. However, because of the response proffered by the majority concerning G.L. 1956 §§ 12–5–1 and 12–5–2, I would simply point out that until the United States Supreme Court reverses its holding in *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and until this Court reverses its holding in *State v. Locke*, 418 A.2d 843 (R.I.1980), a search warrant to seize a sample of a defendant's breath, blood or urine still is lawfully permitted pursuant to § 12–5–2, where probable cause exists. Section 12–5–2 permits the seizure of any property that is used "in violation of law, or as a means of committing a violation of law; or *** [w]hich is evidence of the commission of a crime." Section 12–5–2(3)(4).

I do not agree with the majority's general statement that blood itself is not property and thus not evidence of the commission of a crime. Blood itself can, in many instances, be evidence of the commission of a crime. In the real world, which certainly includes the State of Rhode Island, a bottle of liquor is property. It is property that can be the subject of larceny or embezzlement and is even taxed as property. Likewise, a cache of cocaine in someone's pocket, car, or dwelling also is considered to be property. The fact that the liquor or drugs are ingested and used by someone in violation of law does not transform that property into non-property.

The majority, however, advances the problematic contention that because they are "not satisfied that one's bodily fluid is property" or "evidence of the commission of a crime" it cannot be seized pursuant to § 12–5–2. What that contention ignores, however, is that it is not the blood that is the evidence being sought by the search warrant, but instead the amount of alcohol or cocaine that is contained in, and is foreign property in the blood. That alcohol and that cocaine was "property" when it went into the defendant's blood stream, and it is still property when later detected,

isolated and identified by chemical analysis. The bodily fluid or blood is not the evidence sought by the search warrant, it is instead the alcohol and illegal cocaine that is contained in the blood and which constitutes evidence of a defendant's commission of the crime of driving-under-the-influence. Accordingly, § 12–5–2 permits it to be seized from wherever that incriminating evidence reasonably can be found.

## IV

### Conclusion

For the reasons above set out, Justice Lederberg and I would respond to Certified Questions One and Two in the negative. Because of the nature of our response to those questions, we need not respond to Certified Question Three, but our response to that question reasonably might be indicated from our brief discussion relating to that question.